1  MARC E. MAYER (SBN 190969)
      mem@msk.com
2  MARK C. HUMPHREY (SBN 291718)
      mxh@msk.com
3  MITCHELL SILBERBERG & KNUPP LLP
   2049 Century Park East, 18th Floor
4  Los Angeles, CA  90067-3120
   Telephone: (310) 312-2000
5  Facsimile: (310) 312-3100

6  Attorneys for Activision Publishing, Inc.

7

8             UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11  ACTIVISION PUBLISHING, INC.,            CASE NO. 2:25-cv-04075

12              Plaintiff,                   **COMPLAINT FOR:**

13         v.                               **(1) TRAFFICKING IN
                                                CIRCUMVENTION DEVICES
14  RYAN ROTHHOLZ a/k/a "Lerggy,"              [17 U.S.C. § 1201]**
    "Lerg," "Lergster," "The Pimp,"
15  "Joker0699," and "Joker"; COLLIN        **(2) VIOLATION OF THE
    GYETVAI a/k/a "Cid" and                     COMPUTER FRAUD AND
16  "CollinOnDex"; JORDAN                        ABUSE ACT [18 U.S.C. § 1030]**
    NEWCOMBE BOOTHEY a/k/a
17  "Bossnight55" and "Aussie"; DOE 1       **(3) INTENTIONAL
    a/k/a "Seemo"; DOE 2 a/k/a "CEO,"            INTERFERENCE WITH
18  "wndprochandler," and "8485"; and            CONTRACTUAL RELATIONS**
    DOES 3 through 10, inclusive,
19                                          **(4) UNFAIR COMPETITION**
                Defendants.
20                                          **Demand For Jury Trial**

21

22

23        Activision Publishing, Inc. ("Activision" or "Plaintiff") alleges as follows:

24

25                    __PRELIMINARY STATEMENT__

26        1.    Activision owns and publishes the *Call of Duty* series of video games

27  (the "COD Games").  Activision seeks to end Defendants' unauthorized

28  development, distribution, and sale of software products designed to disrupt, alter,

or impair the functioning of the COD Games and their multiplayer servers. These software products, which include those known as "Lergware" and "GameHook" (the "COD Hacks"), allow malicious players to disconnect (or "boot") players from multiplayer servers or give them competitive advantages over other players (such as automatic aiming or the ability to locate opponents through walls or other obstacles). The COD Hacks impair and damage Activision's games, its business, and the experience of the COD player community.

2.      Defendant Ryan Rothholz (known most prominently online as "Lerggy") is an individual who initially created the "Lergware" COD Hack, a product designed to enable users to disconnect other players from multiplayer games, crash multiplayer servers, and otherwise harass COD players. After receiving a cease-and-desist letter from Activision demanding that he cease any further development and distribution of his COD Hacks, Rothholz responded by representing that he would comply with Activision's demands: "[W]ith the intention to maintain a cooperative spirit and out of respect for Activision Blizzard's intellectual property rights, I have chosen to comply with the cease and desist notice you have issued. I have voluntarily deactivated all the software that you named in your letter."

3.      In reality, Rothholz simply changed his online alias and distributed his source code to other video game hackers (such as Doe 1 a/k/a "Seemo"). Rothholz then became involved in creating a new COD Hack known as "GameHook." To conceal his unlawful activities from Activision, he recruited others, including Defendants Collin Gyetvai ("Cid") and Jordan Newcombe Boothey ("Bossnight55"), to act as "resellers" of the GameHook COD Hack. Activision is informed and believes, and on that basis alleges, that Defendants have received significant revenue from their activities, to the detriment of Activision and its player community.

4.      Defendants not only know that their conduct is unlawful, but they

Mitchell
Silberberg &
Knupp LLP

engage in that conduct with the deliberate intent to harm Activision, its businesses, and its player community.  Indeed, Activision has given each of Defendants an opportunity to comply with Activision's demands without litigation.  Rather than engage with Activision, each has ignored Activision's outreach, necessitating this lawsuit.

5.    Activision asks this Court to put a stop to Defendants' misconduct.  Activision is entitled to monetary damages, injunctive and other equitable relief, and punitive damages against Defendants.

## JURISDICTION AND VENUE

6.    This is a civil action seeking damages, injunctive relief, and other equitable relief under the anti-circumvention provisions of the DMCA, 17 U.S.C. § 1201, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the laws of the State of California.

7.    This Court has subject matter jurisdiction over Activision's DMCA Anti-Circumvention claims and Computer Fraud and Abuse Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Activision's state law claims for intentional interference with contract and unfair competition, which are so related to Activision's federal claims as to be part of the same case or controversy.

8.    This Court has personal jurisdiction over each of the Defendants, because Defendants have purposefully directed their activities at the United States, and at California in particular, have purposefully availed themselves of the benefits of doing business in California, and have established a continued presence in California.  Activision is informed and believes, and on that basis alleges, that, without limitation:

(a)    The **only** purpose of the COD Hacks is to harm video games developed and published by Activision in the State of California, with the goal of

Mitchell
Silberberg &
Knupp LLP

obtaining substantial (and unlawful) monetary gain for Defendants. Thus, the COD Hacks were developed and designed to target Activision and its products, to devalue the massive investment Activision has made in the COD Games, and to degrade the work of developers, programmers, artists, game designers, software engineers, online security experts, and others who worked on the COD Games. Indeed, the COD Hacks are parasitic in nature, in that they derive value only from the COD Games, and their very existence relies on Activision's continued support for the COD Games, which were created in California and published by a California company.

(b)     Defendants conduct extensive and ongoing business with users in the State of California and the United States. Specifically, Defendants distribute the COD Hacks in the State of California, advertise and market the COD Hacks in the United States and the State of California, and communicate directly with users of the COD Hacks in the United States and in the State of California.

(c)     Defendants target the COD Hacks to users in the United States, including in the State of California, knowing that a substantial market exists for their COD Hacks in the United States.

(d)     Defendants recruit individuals in the United States to distribute the COD Hacks in (and from) the United States, and specifically, California, by reselling the COD Hacks to consumers located there.

(e)     Defendants have entered into, and continue to enter into, contracts with individuals in the State of California, including contracts pursuant to which these individuals license from Defendants the right to install and use the COD Hacks. In return for such licenses, Defendants receive ongoing recurring daily, weekly, or monthly payments from individuals in the United States and the State of California.

(f)     Defendants contract with entities located in the State of California in connection with their businesses. This includes, for example, domain

name registries, hosting or content delivery services, as well as credit card processors and merchant banks.

(g) Defendants engage in conduct that they know is likely to cause harm to Activision in the State of California, including in this District, where Activision is located and has its principal place of business.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this is a judicial district in which a substantial part of the events giving rise to the claims occurred, and/or in which Activision's injuries were suffered.

## THE PARTIES

10. Activision is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Santa Monica, California.

11. Activision is informed and believes, and on that basis alleges, that Defendant Ryan Rothholz a/k/a "Lerggy" is an individual who resides in Antioch, Tennessee. On information and belief, Rothholz was the developer of the COD Hack known as "Lergware" and developed or participated in the development of the COD Hack known as "GameHook" (sometimes referred to by its users as "G H.")

12. Activision is informed and believes, and on that basis alleges, that Defendant Collin Gyetvai a/k/a "Cid" and "CollinOnDex" is an individual who resides in Carbondale, Pennsylvania. On information and belief, Gyetvai participated in the development of GameHook, has acted as a reseller of GameHook via an online storefront on the online marketplace, MySellAuth.com, and has marketed and promoted the GameHook COD Hacks via a dedicated Discord server and via his personal YouTube and X accounts.

13. Activision is informed and believes, and on that basis alleges, that Defendant Jordan Newcombe Boothey is an individual who resides in Whyalla

Stuart, Australia.  On information and belief, Boothey has acted as a reseller of GameHook on the online marketplace, MySellAuth.com, and has marketed and promoted the GameHook COD Hacks via a dedicated Discord server.

14.     Activision is informed and believes, and on that basis alleges, that Defendant Doe 1 a/k/a Seemo ("Seemo") is an individual whose identity has not yet been confirmed by Activision.  On information and belief, Seemo is a software developer who participated in the development of GameHook and/or has developed (or is in the process of developing) other COD Hacks, such as the product known as "OneShot."

15.     Activision is informed and believes, and on that basis alleges, that Defendant Doe 2 a/k/a CEO, wndprochandler, and 8485 ("CEO") is an individual whose identity has not yet been confirmed by Activision.  On information and belief, CEO is a software developer who participated in the development of GameHook and/or has developed (or is in the process of developing) other COD Hacks.

16.     The true names and capacities, whether individual, corporate, associate, or otherwise, of the Doe Defendants, including Seemo and CEO, are unknown to Activision, which has therefore sued said Defendants by such aliases and fictitious names.  Among the Doe defendants are developers, resellers, technical support staff, and other individuals who have participated in the development, sale, and distribution of the COD Hacks.  Activision will seek leave to amend this complaint to state their true names and capacities once said Defendants' identities and capacities are ascertained.

17.     Activision is informed and believes, and on that basis alleges, that all Defendants sued herein are liable to Activision as a result of their participation in all or some of the acts set forth in this Complaint.  (All of the aforementioned Defendants, both the named Defendants and the Doe Defendants, are referred to herein collectively as "Defendants.")

Mitchell Silberberg & Knupp LLP

18.     Activision is informed and believes, and on that basis alleges, that at all times mentioned in this Complaint, each of the Defendants was the agent of each of the other Defendants and, in doing the things alleged in this Complaint, was acting within the course and scope of such agency.

## FACTS APPLICABLE TO ALL CLAIMS
### Activision's Intellectual Property Rights

19.     Activision is the publisher and owner of all rights, title, and interest in the copyrights in the COD Games, which consist of more than 18 video games released since 2003 on various video game platforms. Activision's copyrights in the COD Games include, without limitation, rights in and to the COD Games' computer software and the audiovisual works and screen displays that are created when the COD Game software interacts with a user's computer. Activision's copyrights in the COD Games also include the dynamic non-literal elements created when the COD Games' software interacts with the COD Games' online multiplayer game servers. *See MDY Indus. v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010). Activision possesses valid, registered copyrights in each of the COD Games.

### The COD Games

20.     The COD Games have been released annually, with live operations and with additional downloadable content released regularly. The COD Games are consistently among the best-selling games in a given year, having sold hundreds of millions of copies to date. Among Activision's popular COD Games are *Call of Duty Modern Warfare, Call of Duty: Modern Warfare 2, Call of Duty: Black Ops 6,* and *Call of Duty: Warzone.*

21.     The COD Games are "first-person shooter" video games that allow players to step into the shoes of soldiers and elite operators in combat throughout history, ranging from World War II to modern day and into the future. Nearly all

Mitchell
Silberberg &
Knupp LLP

of the COD Games include single player campaign story modes which place players within a fictional narrative. However, all COD Games include competitive online multiplayer modes, where players join online to play together in real-time. Each of the COD Games offer as many as a dozen or more different online multiplayer game types, all of which are extremely intense as players compete to earn experience points, increase their rankings and statistics, and acquire various rewards for winning matches and achieving certain goals and objectives.

22. In March 2020, Activision released *Call of Duty: Warzone* ("CODWZ"), a free standalone multiplayer game that is offered to the public without requiring that the customer purchase a copy of any *Call of Duty* game. In order to play *Call of Duty: Warzone*, a member of the public must register an account with Activision, download the *Call of Duty: Warzone* software, and connect to Activision's online multiplayer servers. The revenue Activision generates through *Call of Duty: Warzone* comes exclusively from sales of "virtual goods" (*i.e.*, weapons, skins, etc.) or seasonal "battle passes" that enable the player to receive in-game rewards for accomplishments within the game. Such revenue helps pay for the enormous cost of updating, improving, and maintaining the COD Games and their competitive online modes.

23. Activision works very hard to ensure that the COD Games offer consistently compelling player experiences so that customers will remain engaged in the COD Games, continue to play them for sustained periods of time, and be excited about future releases. If players perceive that a game is unfair or that the multiplayer experience is not working properly, including because others are cheating or disrupting and/or hacking multiplayer servers, players may grow frustrated with the COD Games, become less interested in playing and supporting them (including by purchasing new games and items) and may even stop playing entirely. Cheating and hacking therefore not only harms (and could even destroy) COD player communities, but also impacts Activision's ability to offer the fast-

paced, stable, high-quality online gameplay millions of fans have come to expect from Activision and the COD Games.

**<u>Activision's Efforts To Protect Against Hackers And Cheaters</u>**

24.     Because the COD Games are so popular, unscrupulous individuals such as Defendants seek to exploit the games for their own personal gain and profit by selling cheats, hacks, and other malicious software, knowing full well that they are ruining the experience for other players and harming Activision.  For this reason, Activision undertakes significant efforts to protect the integrity of the COD Games through both technical and contractual means.

<u>Technical Protection</u>

25.     One way that Activision seeks to protect the COD Games from cheating or unauthorized exploitation is by developing and employing anti-cheat and other online security technologies.  These technologies help detect when players are using third party cheating or hacking software, and prevent unauthorized access to the COD Games by those players.  It is not possible to play the COD Games' online multiplayer modes without installing Activision's anti-cheat technologies.

26.     When Activision identifies or detects that a player is using cheating software, the player's account may be suspended or "banned," such that the player may no longer access the game and its remote server.

27.     In order for any hack or cheat software to operate, it must be designed to prevent or avoid detection by Activision's anti-cheat software, such as by concealing itself or by disabling the anti-cheat technology.  Otherwise, the software will be detected and the user will be denied access to the particular game's online multiplayer functionality, and may even be permanently banned from playing the game.

Mitchell
Silberberg &
Knupp LLP

**COMPLAINT**

Contractual Protection

28. In order to access or play the COD Games, users must create and register accounts with Activision. After installation and upon first playing the COD Games, users must expressly assent to Activision's Terms of Use (collectively, the "TOU") by clicking through them. If the user refuses to consent to the TOU, they cannot proceed and play the game. After agreeing to the TOU (and other agreements), users are prompted to create an Activision account (or log into an existing account), and cannot proceed to play the COD Games until they do so.

29. The TOU includes a limited license agreement between Activision and its users. Under the TOU, Activision grants to users a "personal, limited, non-exclusive license" to use its games for "non-commercial use," expressly conditioned upon the user's compliance with the TOU. Among other provisions, by assenting to the TOU, users expressly agree not to "use, develop, host or distribute cheats, automation software (bots), modded lobbies, hacks, mods or any other unauthorized third-party software" in connection with Activision's games "or engage in any form of cheating, boosting, or booting[.]"

30. Players of COD Games (including *Call of Duty: Warzone*) also are required to abide by the Code of Conduct posted at https://www.callofduty.com/values (the "Code of Conduct"). The Code of Conduct provides, among other things, that players must "compete with integrity" when playing the COD Games against other players, and expressly states that "[c]heating and griefing or other threats to fair play will not be tolerated." The Code of Conduct further states that players are responsible for how their accounts are used, and that "[t]he use of cheats, including third-party software, is unacceptable." For the avoidance of any doubt, the Code of Conduct provides that "engaging in any activity that grants an unfair advantage is considered cheating."

Mitchell
Silberberg &
Knupp LLP

**COMPLAINT**

31.     The COD Games' online multiplayer modes (as well as the entire *Call of Duty: Warzone* game) are made available to the public through Activision's proprietary servers and matchmaking systems.  It is not possible for a user to lawfully obtain access to or play the COD Games' online multiplayer modes without expressly consenting to the TOU, and users only maintain such access provided they are in compliance with the Code of Conduct.  Activision provides access to the COD Games and their multiplayer servers in reliance on players' consent to the TOU.

32.     As set forth below, Activision is informed and believes, and on that basis alleges, that Defendants are engaged in various activities related to developing, updating, marketing, distributing, selling, and supporting the COD Hacks.

### Rothholz and Lergware

33.     Activision is informed and believes, and on that basis alleges, that Defendant Ryan Rothholz developed a COD Hack known as "Lergware."  The primary function of Lergware is to enable its users to disrupt COD matches and harass other COD players by, for example, kicking or "booting" other players from multiplayer games without their knowledge or consent.  In other words, using the Lergware software product, mean-spirited players could harass others by causing them to lose their connection to the COD Games or cause their COD Games' software to crash or stop working.

34.     Activision is informed and believes, and on that basis alleges, that Rothholz developed and released Lergware in or about 2021 or 2022.  Rothholz made Lergware available for sale (for $25) via his dedicated website.  He also made multiple versions of source code for Lergware (e.g. "Lergware-t7," "Lergware-trainer-t8") available on a software code repository.

35.     Activision is informed and believes, and on that basis alleges, that in or about 2023, Rothholz updated Lergware so that it would work with Activision's

Mitchell Silberberg & Knupp LLP

11
**COMPLAINT**

popular games *Call of Duty: Modern Warfare II* and *Call of Duty: Warzone.*  The update resulted in online player "attacks" becoming increasingly frequent, causing some users to post warning messages online.

36.    On or about June 1, 2023, Activision sent a cease-and-desist letter to Rothholz advising him that Lergware violated Activision's intellectual property rights.  The letter demanded that Rothholz immediately cease and desist from any further development, sale, or distribution of Lergware.

37.    In response to Activision's cease-and-desist letter, Rothholz posted the letter to an online Discord community dedicated to Lergware and openly mocked Activision.

38.    Nevertheless, on or about June 7, 2023, Rothholz posted the following to his X profile (@lergware):



39.    On or about June 12, 2023, Rothholz sent a purported "compliance confirmation" email to Activision.  In his "compliance confirmation," Rothholz denied that his conduct infringed any of Activision's intellectual property rights, but agreed to comply with Activision's demands:

> I hope this message finds you well. I am writing in response to your letter received on Tuesday, June 6th, 2023, alleging infringement of Activision Blizzard lnc.'s intellectual property rights.

> Firstly, I want to clarify that this email should not be interpreted as an acknowledgment of your claim, nor an admission of guilt on my part.
>
> However, with the intention to maintain a cooperative spirit and out of respect for Activision Blizzard's intellectual property rights, I have chosen to comply with the cease and desist notice you have issued. I have voluntarily deactivated all the software that you named in your letter. This action was taken not as an acceptance of liability but as a gesture of goodwill.

40.     In reliance on Rothholz's representations, Activision did not pursue litigation against Rothholz in 2023.

## Defendants and GameHook

41.     Activision is informed and believes, and on that basis alleges, that, contrary to his representation that he would comply with Activision's demands, Rothholz did not actually cease developing, distributing, and exploiting COD Hacks.  Instead, Rothholz "rebranded" or modified Lergware, changed his online alias, transferred or sold his source code to others (including Defendant Doe 1 a/k/a "Seemo"), and/or began working with individual "resellers" to distribute the product under a different name.

42.     Activision is informed and believes, and on that basis alleges, that Rothholz, with the assistance of Defendants Gyetvai, Boothey, and one or more of the Doe Defendants, developed and distributed a new version of Lergware known as "GameHook."  GameHook was made available for several COD Games, including *Call of Duty: Modern Warfare II, Call of Duty: Modern Warfare III, Call of Duty: Black Ops Cold War,* and *Call of Duty: Black Ops 6.*

43.     Like the Lergware COD Hacks, GameHook includes a set of self-titled "Toxic" features and functions, including features that enable users to "kick" or disconnect other players from Activision's multiplayer servers (sometimes referred to as a "rage" cheat) and/or to crash multiplayer servers.  Additionally,

Mitchell Silberberg & Knupp LLP

GameHook offers a variety of features that allow players to cheat or gain unfair advantages over other players.  Such features include, without limitation, "aimbots," which cause weapons to automatically hit opponents, and "ESP Bots," which identify opponent positions and allow players to see through walls or other obstacles.

44.    Activision is informed and believes, and on that basis alleges, that GameHook incorporates code from Lergware and was developed, in whole or in part, by Rothholz, with assistance from Defendant Gyetvai.

45.    Activision is informed and believes, and on that basis alleges, that in an effort to conceal his involvement with GameHook, Rothholz changed his online alias from "Lerggy" to "Joker."  However, he continued to use the same Discord account and user ID.  Additionally, instead of selling GameHook directly to end-users, Rothholz engaged friends and online community members to act as GameHook "resellers."  These resellers sell the GameHook COD Hacks on Rothholz's behalf and retain a portion of the revenue from such sales.  Among the most prominent of these resellers were Gyetvai and Boothey (collectively the "Reseller Defendants"), along with an individual known as "Skyserpent."

46.    Each of the Reseller Defendants operated websites or online storefronts from which versions of GameHook could be purchased by members of the public.  Activision is informed and believes, and on that basis alleges, that the Reseller Defendants offered versions of GameHook for sale for at least $50.00 per COD Game and up to $375 for lifetime access to a "master key" to use all GameHook versions for all supported COD Games.  On information and belief, hundreds, if not thousands, of individuals purchased GameHook and used it to cheat in the COD Games or disconnect COD players from multiplayer games.

47.    Activision is informed and believes, and on that basis alleges, that more than a thousand players of Activision's most recent COD title, *Call of Duty:*

Mitchell Silberberg & Knupp LLP

*Black Ops 6,* have been impacted by GameHook, including by being kicked from multiplayer matches or suffering unexpected server crashes.

48.    In March 2025, Activision sent cease-and-desist letters to Rothholz, Gyetvai, Skysserpent, and Boothey.  The cease-and-desist letters demanded, among other things, that each recipient cease any further development or distribution of GameHook or any other COD cheating or hacking software.  Activision is informed and believes, and on that basis alleges, that Rothholz, Gyetvai, Skysserpent, and Boothey each received the cease-and-desist letters, and some of them even posted online about their receipt of the letters.

49.    In mid-March 2025, apparently in response to the letters, Gyetvai, Skysserpent, and Boothey shuttered their online storefronts.  However, despite acknowledging online that they had received the letters, Rothholz, Gyetvai, and Boothey did not contact Activision and did not confirm that they would cease from creating or selling COD Hacks.  Additionally, none of these individuals provided copies of the GameHook source code to Activision.

50.    Activision is informed and believes, and on that basis alleges, that Rothholz, Gyetvai, and Boothey do not intend to refrain from developing and distributing COD Hacks.  To the contrary, given Rothholz's prior conduct as alleged herein, Activision has reason to believe that Rothholz, Gyetvai, and Boothey are continuing to distribute or sell the GameHook COD Hacks or other COD Hacks through private channels or via the GameHook Discord server.

51.    Additionally, or alternatively, Activision has reason to believe that Rothholz, Gyetvai, and Boothey intend to "re-brand" GameHook and offer the GameHook COD Hacks or similar COD Hacks under a different title, using different online aliases.  Activision has attempted to reach out to Rothholz, Gyetvai, and Boothey informally, but they have not responded to Activision's outreach.  Accordingly, Activision had no choice but to file this lawsuit.

## **Defendants' Unlawful Activities**

52.     Activision is informed and believes, and on that basis alleges, that in order for any of the COD Hacks, including Lergware or GameHook, to operate with the COD Games, such software necessarily includes technology that primarily is designed to avoid, bypass, evade, or otherwise circumvent Activision's anti-cheat and access control technologies.  Defendants also advertise and promote the COD Hacks as effectively circumventing Activision's anti-cheat software. Accordingly, each time Defendants distribute or sell a license to any of the COD Hacks, they are trafficking in technology that controls access to the COD Games.

53.     Each time a player uses a COD Hack, he or she also violates Activision's TOU, including those provisions that specifically prohibit players from "us[ing], develop[ing], host[ing] or distribut[ing] cheats, automation software (bots), modded lobbies, hacks, mods or any other unauthorized third-party software" in connection with Activision's games "or engag[ing] in any form of cheating, boosting, or booting."  Accordingly, Activision is informed and believes, and on that basis alleges, that as a result of Defendants' conduct, hundreds or thousands of breaches of these contracts have occurred.

54.     Activision is informed and believes, and on that basis alleges, that Defendants are fully aware that the use of the COD Hacks violates the TOU. Indeed, the COD Hacks have no purpose or function other than to enable players to gain unauthorized access to Activision's servers and violate the TOU by using cheats and exploits.  Thus, Defendants' goal is to ensure that their customers continue to receive the benefits of their contracts with Activision (i.e., access to the COD Games and their multiplayer experience) while they simultaneously engage in continuing breaches of their obligations under these contracts.

55.     By their conduct, Defendants have caused and are continuing to cause serious harm to the COD Games and to Activision.  Such harm is immediate, massive and irreparable, and includes (but is not limited to) the following:

(a)     Defendants irreparably harm the ability of Activision's legitimate customers to enjoy and participate in the online experiences carefully created by Activision.  As a result, Activision has suffered, and continues to suffer, loss of player revenues.

(b)     Defendants' knowing and willful misconduct has forced Activision to expend substantial resources attempting to remediate the damage caused by the COD Hacks.  This includes creating and releasing updates to the COD Games that counteract the COD Hacks, responding to player complaints, employing personnel to police the games to detect the use of the COD Hacks, and "banning" users who are using the COD Hacks.

(c)     Defendants' conduct harms Activision's reputation and results in the loss of significant customer goodwill.  In fact, GameHook has been so frustrating to COD players that it received significant attention on social media and, on information and belief, has caused players to stop playing or avoid the PC version of *Call of Duty: Black Ops 6*.

56.     Defendants' conduct has resulted in damage to Activision in an amount to be proven at trial.  By Activision's estimation, such damage may amount to millions of dollars.

57.     Unless and until Defendants are preliminarily or permanently enjoined, Activision will continue to suffer severe harm from the COD Hacks.

## COUNT I

## Trafficking In Circumvention Devices

58.     Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 57, as if set forth fully herein.

59.     The COD Games, including but not limited to their source code and audiovisual game play environments, are copyrighted works.

Mitchell Silberberg & Knupp LLP

60.    Activision has incorporated into the COD Games technological measures that effectively control access to the COD Games, including access to the dynamic audiovisual elements that comprise the game.

61.    The COD Hacks are comprised of or contain technologies, products, services, devices, components, or parts thereof that primarily are designed or produced for the purpose of circumventing technological measures that effectively control access to the COD Games.

62.    The COD Hacks (and the portions thereof that circumvent Activision's anti-cheat technologies) have no commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a copyrighted work and that protects the exclusive rights of a copyright owner.

63.    Defendants market the COD Hacks in the United States with knowledge of their use to circumvent Activision's technological access controls.

64.    As a result of the foregoing, Defendants are offering to the public, providing, importing, or otherwise trafficking in technology that violates 17 U.S.C. § 1201(a)(2).

65.    Defendants' acts constituting DMCA violations have been and continue to be performed without the permission, authorization, or consent of Activision.

66.    Defendants have violated Section 1201 of the DMCA willfully and for private commercial gain.

67.    Defendants' conduct has caused damage to Activision and has unjustly enriched Defendants, in an amount to be proven at trial.

68.    As a result of Defendants' acts and conduct, Activision has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Activision is informed and believes, and on that basis alleges, that, unless enjoined and restrained by this Court,

Defendants will continue to violate Section 1201 of the DMCA.  Activision is entitled to injunctive relief to restrain and enjoin Defendants' continuing unlawful conduct.

69.    As a direct and proximate result of Defendants' conduct, pursuant to 17 U.S.C. § 1203(c), Activision is entitled to Defendants' profits attributable to their violations of 17 U.S.C § 1201.

70.    Alternatively, Activision is entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 1203(c)(3)(A), in the amount of $2,500 with respect to each violation by Defendants.

71.    Activision further is entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 1203(b).

## COUNT II

## Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*

72.    Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 71, as if set forth fully herein.

73.    Activision's COD Game Servers (the "Game Servers") are computer servers used by Activision to engage in interstate and foreign commerce.  The Game Servers are protected computers under 18 U.S.C. § 1030(e)(2).

74.    By developing, marketing, distributing, and encouraging the use of the COD Hacks, Defendants have knowingly aided and abetted, conspired with, or otherwise caused players of the COD Games to (a) intentionally access the Game Servers without Activision's authorization and/or (b) knowingly cause the transmission of a program, information, code, or command in order to intentionally cause damage to the Game Servers.

75.    As a result of Defendants' conduct, Activision has suffered damages in excess of the $5,000 statutory minimum.  Activision has been damaged by Defendants' actions, including in the form of decreased participation by players in

Mitchell
Silberberg &
Knupp LLP

19
**COMPLAINT**

the Games, investigative costs and legal fees, and the expenditure of resources to detect players who access the Game Servers without authorization.

76.    Activision has also suffered irreparable and incalculable harm and injuries resulting from Defendants' conduct in the form of damages to their customers' goodwill and trust.

77.    On information and belief, Defendants have continued to conspire to obtain unauthorized access to or to damage the Game Servers with the intent of harming Activision and will continue to do so unless enjoined.

## COUNT III

## Intentional Interference With Contractual Relations

78.    Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 77, as if set forth fully herein.

79.    As described herein, in order to install and play the COD Games, licensed users in the United States first must assent to Activision's TOU. In addition to the TOU, licensed users also are required to comply with the Code of Conduct, in particular as relates to cheating and any other activities that grant an unfair advantage.

80.    Activision's contracts with its users are valid and enforceable.

81.    Each time a purchaser of the COD Hacks uses a COD Hack in connection with the COD Games, he or she breaches the TOU and the Code of Conduct. Activision is informed and believes, and on that basis alleges, that thousands of such breaches have taken place by Defendants' customers.

82.    Activision is informed and believes, and on that basis alleges, that Defendants are aware of both the existence and specific relevant terms of contracts between Activision and its users in the United States, including the TOU and Code of Conduct. Specifically, Defendants are aware that the TOU and Code of Conduct prohibit players from using the COD Hacks and that players are at risk of

Mitchell
Silberberg &
Knupp LLP

1  being banned from the COD Games should they be caught using the COD Hacks.

2  Nevertheless, Defendants intentionally encourage and induce users of the COD

3  Games to purchase and use the COD Hacks, knowing that the use of these products

4  by their customers is a breach of these customers' contracts with Activision.

5      83.    By inducing Activision's users to breach their contracts with

6  Activision, Defendants have intentionally interfered, and continue to interfere, with

7  the contracts between Activision and its users.

8      84.    As a direct and proximate result of Defendants' actions, Activision

9  has suffered damages in an amount to be proven at trial, including but not limited

10  to a loss of goodwill among users of Activision's games, diversion of Activision's

11  resources to attempt to detect and prevent the use of the COD Hacks, decreased

12  profits, and a loss of profits from users whose accounts Activision has terminated

13  for violation of the TOU and Code of Conduct in the United States.

14      85.    As a further result of Defendants' actions, Defendants have unjustly

15  obtained specifically identifiable property, consisting of all of the proceeds

16  attributable to the sale of the COD Hacks in the United States, and any other

17  products or services that violate any of Activision's rights, and any additional

18  property traceable to those proceeds.  Those proceeds, which are directly

19  attributable to Defendants' manipulation and misuse of the COD Games and

20  intentional interference with Activision's contracts, rightfully and equitably belong

21  to Activision.

22      86.    Defendants' intentional interference with the contracts between

23  Activision and its licensed users in the United States entitles Activision to

24  injunctive relief and compensatory damages, the imposition of a constructive trust

25  over Defendants' wrongfully obtained proceeds, and other available relief.

26      87.    Defendants are guilty of oppression, fraud, or malice, and Activision,

27  in addition to its actual damages, by reason thereof, is entitled to recover

28  exemplary and punitive damages against Defendants.

## COUNT IV

## <u>Unfair Competition</u>

88.     Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 87, as if set forth fully herein.

89.     The acts and conduct of Defendants constitute unfair competition in the United States under California Business & Professions Code § 17200 *et seq.* and under California common law.

90.     As a direct and proximate result of Defendants' unfair competition in the United States, Activision has been damaged, and Defendants have been unjustly enriched, in an amount to be proven at trial for which damages and/or restitution and disgorgement is appropriate.  Such damages and/or restitution and disgorgement should include a declaration by this Court that Defendants are constructive trustees for the benefit of Activision, and an order that Defendants convey to Activision the gross receipts received or to be received that are attributable to the sale of the COD Hacks in the United States.

91.     Defendants are guilty of oppression, fraud or malice, and Activision, in addition to its actual damages, by reason thereof, is entitled to recover exemplary and punitive damages against Defendants.

92.     As a result of Defendants' acts and conduct in the United States, Activision has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Activision is informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, Defendants will continue to engage in unfair competition. Pursuant to California Business & Professions Code § 17203, Activision is entitled to temporary, preliminary, and permanent injunctions prohibiting further acts of unfair competition.

Mitchell
Silberberg &
Knupp LLP

**COMPLAINT**

## **PRAYER FOR RELIEF**

WHEREFORE, Activision prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief, including but not limited to an order:

1.    Preliminarily and permanently enjoining Defendants, their officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, affiliates, and all persons acting in concert or participation with Defendants from: (i) trafficking in circumvention devices in the United States; (ii) improperly accessing or damaging Activision's protected servers without authorization; (iii) intentionally interfering with Activision's or its affiliates' contracts with players in the United States; and (iv) engaging in unfair competition in the United States.

2.    Requiring Defendants to shut down the COD Hacks, any forthcoming software that allows players to cheat in any game published by Activision or its affiliates, and any colorable copies thereof, hosted at any domain, address, location, or ISP.

3.    Requiring Defendants to deliver to Activision for impoundment or destruction all copies of materials that infringe or violate any of Activision's rights, as described herein, including, without limitation, the source code for the COD Hacks.

4.    Requiring Defendants to provide Activision with an accounting of any and all sales of products or services in the United States that infringe or violate any of Activision's or affiliates' rights, as described herein.

5.    Awarding Activision actual or maximum statutory damages for violation of Section 1201 of the DMCA, as appropriate, pursuant to 17 U.S.C. § 1203(c).

6.    Awarding Activision exemplary and punitive damages against Defendants on Activision's cause of action for intentional interference with contractual relations.

Mitchell
Silberberg &
Knupp LLP

23

**COMPLAINT**

7.     Awarding Activision restitution of Defendants' unlawful proceeds, including an accounting of any and all sales of the COD Hacks in the United States, and/or any other products or services that violate any of Activision's rights described herein.

8.     Imposing a constructive trust over the proceeds unjustly obtained by Defendants through the sales of the COD Hacks in the United States, and/or any other products or services that violate any of Activision's rights described herein.

9.     Awarding such other and further relief as this Court may deem just and appropriate.

DATED: May 7, 2025                    MARC E. MAYER
                                     MARK C. HUMPHREY
                                     MITCHELL SILBERBERG & KNUPP LLP


                                     By: */s/ Marc E. Mayer*
                                         Marc E. Mayer (SBN 190969)
                                         Mark C. Humphrey (SBN 291718)
                                         Attorneys for Activision Publishing, Inc.

Mitchell
Silberberg &
Knupp LLP

**COMPLAINT**

1

## **<u>JURY DEMAND</u>**

Activision Publishing, Inc. demands a trial by jury on all issues so triable.

DATED: May 7, 2025                        MARC E. MAYER
                                                            MARK C. HUMPHREY
                                                            MITCHELL SILBERBERG & KNUPP LLP


By: *<u>/s/ Marc E. Mayer</u>*
         Marc E. Mayer (SBN 190969)
         Mark C. Humphrey (SBN 291718)
         Attorneys for Activision Publishing, Inc.