MARC E. MAYER (SBN 190969)
  mem@msk.com
MARK C. HUMPHREY (SBN 291718)
  mxh@msk.com
HANNAH G. SHEPHERD (SBN 347611)
  hgs@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Activision Publishing, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC., <br><br> Plaintiff, <br><br> v. <br><br> RYAN ROTHHOLZ a/k/a "Lerggy," "Lerg," "Lergster," "The Pimp," "Joker0699," and "Joker"; COLLIN GYETVAI a/k/a "Cid" and "CollinOnDex"; JORDAN NEWCOMBE BOOTHEY a/k/a "Bossnight55" and "Aussie"; DOE 1 a/k/a "Seemo"; DOE 2 a/k/a "CEO," "wndprochandler," and "8485"; and DOES 3 through 10, inclusive, <br><br> Defendants. | CASE NO. 2:25-cv-04075-SPG-(BFMx) <br><br> Judge: Hon. Sherilyn Peace Garnett <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF ACTIVISION PUBLISHING, INC. IN OPPOSITION TO DEFENDANT RYAN ROTHHOLZ'S MOTION TO DISMISS** <br><br> Date:        November 5, 2025 <br> Time:        1:30 pm <br> Location:   Courtroom 5C <br><br> Filed: May 7, 2025 |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   STATEMENT OF FACTS ..................................................................... 2

III.  ROTHHOLZ'S PROCEDURAL CHALLENGES ARE WITHOUT MERIT AND SHOULD BE DENIED ............................................................ 7

      A.   Service Has Been Properly Effectuated On Rothholz ......................... 7

      B.   This Court Has Specific Personal Jurisdiction Over Rothholz ............. 8

           1.   Rothholz Purposefully Directed His Activities At California. ................................................................. 10

           2.   Activision's Claim Arises Out Of Rothholz's Forum-Related Activities ....................................................... 13

           3.   The Exercise of Jurisdiction is Not Unreasonable ................... 13

      C.   Venue is Proper In This District. ......................................... 15

IV.   ACTIVISION HAS SUFFICIENTLY STATED A CLAIM ON WHICH RELIEF CAN BE GRANTED ............................................................... 16

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*3DO Co. v. Poptop Software, Inc.*,
   1998 WL 962202 (N.D. Cal. Oct. 27, 1998) ...................................................... 11

*Activision Publishing, Inc. v. EngineOwning UG*,
   No. CV 22-0051-MWF (JCX), 2023 WL 3272399 (C.D. Cal. Apr. 4,
   2023)
   ...................................................................................... 9, 11, 12, 13, 14

*Amini Innovation Corp. v. JS Imports, Inc.*,
   497 F. Supp. 2d 1093 (C.D. Cal. 2007) ............................................................ 12

*Asahi Metal Indus. Co. v. Sup.Ct.*,
   480 U.S. 102 (1987) .......................................................................................... 10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................................... 16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................................... 16

*Blizzard Ent., Inc. v. Bossland GmbH*,
   No. SA CV 16-1236-DOC, 2017 WL 412262 (C.D. Cal. Jan. 25, 2017)
   ............................................................................................ 9, 10, 11, 12, 13, 14

*Blizzard Ent., Inc. v. Joyfun Inc Co., Ltd.*,
   CV 19-1582-JVS, 2020 WL 1972284 (C.D. Cal. Feb. 7, 2020) ......................... 9

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ....................................................................................... 9, 13

*Burri Law PA v. Skurla*,
   35 F.4th 1207 (9th Cir. 2022) ..................................................................... 10, 12

*Calder v. Jones*,
   465 U.S. 783 (1984) ....................................................................................... 2, 10

*CollegeSource, Inc. v. AcademyOne*,
   Inc., 653 F. 3d 1066, 1079 (9th Cir. 2011) ...................................................... 12

Mitchell
Silberberg &
Knupp LLP

20813487.5

ii

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Core-Vent Corp. v. Nobel Indus. AB*,
   11 F.3d 1482 (9th Cir. 1993) ............................................................... 15

*CYBERsitter, LLC v. People's Republic of China*,
   805 F. Supp. 2d 958 (C.D. Cal. 2011) ................................................. 10

*Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*,
   840 F.2d 685 (9th Cir. 1988) ................................................................. 7

*Dole Food Co., Inc. v. Watts*,
   303 F.3d 1104 (9th Cir.2002) ...................................................... 8, 9, 15

*Facebook, Inc. v. Power Ventures, Inc.*,
   844 F.3d 1058 (9th Cir. 2016) ............................................................. 19

*Hendricks v. New Video Channel Am., LLC*,
   2015 WL 3616983 (C.D. Cal. June 8, 2015) ....................................... 10

*Lang Van, Inc. v. VNG Corp.*,
   40 F.4th 1034 (9th Cir. 2022) .............................................................. 11

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
   647 F.3d 1218 (9th Cir. 2011) ............................................................. 10

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
   629 F.3d 928 (9th Cir. 2010) ............................................................... 19

*Myers v. Bennett Law Offices*,
   238 F.3d 1068 (9th Cir. 2001) ............................................................. 15

*Nayab v. Cap. One Bank (USA), N.A.*,
   942 F.3d 480 (9th Cir. 2019) ............................................................... 20

*Panavision Int'l, L.P. v. Toeppen*,
   141 F.3d 1316 (9th Cir. 1998) ............................................................. 14

*Rio Props., Inc. v. Rio Int'l Interlink*,
   284 F.3d 1007 (9th Cir. 2002) .................................................. 8, 14, 15

*Riot Games, Inc. v. Suga Pte, Ltd.*,
   638 F. Supp. 3d 1102 (C.D. Cal. 2022) ............................................... 10

iii

Mitchell
Silberberg &
Knupp LLP

20813487.5

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Slaughter v. Legal Process & Courier Serv.*,
   162 Cal. App. 3d 1236 (Ct. App. 1984) ................................................................. 8

*Soo Park v. Thompson*,
   851 F.3d 910 (9th Cir. 2017) ........................................................................... 16

*Volks USA Inc. v. A2 Hosting, Inc.*,
   2016 WL 6808113 (C.D. Cal. Nov. 16, 2016) ................................................... 16

### STATUTES

17 U.S.C.
   § 1201 .......................................................................................................... 19

18 U.S.C.
   § 1030(a)(2)(C) ............................................................................................ 19

28 U.S.C.
   § 1391 ............................................................................................................ 2
   § 1391(b)(2) ................................................................................................. 15

### OTHER AUTHORITIES

Fed. R. Civ. P.
   4 ...................................................................................................................... 7
   4(e) ................................................................................................................. 8
   4(e)(2)(B) ........................................................................................................ 7
   12(b)(6) ...................................................................................................... 7, 16

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Defendant Ryan Rothholz ("Rothholz")'s omnibus Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, Insufficient Service of Process, and Failure to State a Claim (the "Motion") should be denied.  Rothholz's five-page Motion is wholly conclusory, comprised of threadbare and scattershot legal principles, and lacking analysis of the allegations in the Complaint or the facts of this lawsuit.

The Complaint filed by Activision Publishing, Inc. ("Activision") is detailed, comprehensive, and contains numerous specific factual allegations that easily support both the merits of the claims and the exercise of personal jurisdiction over Rothholz.  Activision is a Santa Monica-based publisher of video games, including the immensely popular *Call of Duty* ("COD") video game franchise.  Rothholz is an individual who has developed a business creating and distributing malicious software products that disrupt the online experience for Activision's games.  Rothholz's software, known variously as Lergware and Gamehook, enables users to gain unfair advantages (i.e. cheat) in the game or to harass other players by disconnecting them from the multiplayer game servers or crashing Activision's servers.  For years, Activision has attempted to resolve this matter without litigation, including by sending no fewer than three cease-and-desist letters to Rothholz.  Rothholz, however, chose instead to play a game of cat-and-mouse, pretending to comply with Activision's demands while secretly creating a new online alias, distributing his source code to other hackers, and then "re-branding" his software and selling it through friends who act as "resellers."

The Motion is Rothholz's latest attempt to evade responsibility for his conduct.  As set forth below, each of his procedural challenges (to service, jurisdiction, and venue) are wholly without merit.  Specifically:

- Rothholz's claim that service was improper or ineffective is without basis. By appearing in this action and filing this Motion, Rothholz concedes that he has been given adequate notice of this lawsuit and a full and fair opportunity to respond and present his defense.

- This Court has personal jurisdiction over Rothholz under the three-prong *Calder* "effects" test because he engaged in intentional acts that targeted California consumers, the COD software product, and Activision, a California-based company. Rothholz also has not claimed, and cannot claim, that the exercise of jurisdiction would be so unreasonable as to create a due process violation.

- Venue is proper under 28 U.S.C. § 1391 because a substantial amount of the Defendants' activities took place within the Central District, and Activision's injury was primarily felt in Los Angeles, where it is headquartered.

Activision also has alleged sufficient facts to support each of its claims for relief, including that Rothholz is the individual who created the COD Hacks at issue, the COD Hacks circumvent Activision's technological anti-cheat protections, the use of his COD Hacks enable and encourage unauthorized access to Activision's protected COD remote servers, and his actions directly caused Activision to suffer cognizable harm.

Accordingly, the Court should deny the Motion in its entirety and require Rothholz to promptly answer the Complaint.

## II. STATEMENT OF FACTS

**Activision and The *Call of Duty* Franchise.** Activision is the publisher and owner of all rights, title, and interest in the copyrights in the Call of Duty games (the "COD Games"), which consist of more than 18 video games released since 2003 on various video game platforms. Complaint ¶ 19. Activision is located in California, and has its principal place of business in Santa Monica. *Id.* ¶ 8, 10.

Among Activision's most popular video game franchises are the *Call of Duty* series of video games. The COD Games are "first-person shooters," in which players step into the shoes of soldiers and elite operators in combat throughout history. *Id.* ¶ 21. All of the COD Games include competitive online multiplayer modes where players join online to play together in real-time. *Id.* Multiplayer sessions in the COD Games are extremely competitive and intense, as players compete against one another to earn experience points, increase their rankings and statistics, and acquire various rewards for winning matches and achieving certain goals and objectives. *Id.*

**Activision's Efforts to Protect Against Hackers.** Activision employs both contractual and technological measures to protect the integrity of its games. First, to play the COD Games and access the COD remote servers, players must consent to Activision's Terms of Use, which explicitly prohibits the use, development, hosting, or distribution of "cheats, automation software (bots), modded lobbies, hacks, mods or any other unauthorized third-party software" in connection with Activision's games, "or engage in any form of cheating, boosting, or booting[.]" Complaint ¶¶ 28-29. Second, Activision has developed and employs anti-cheat and other online security technologies. *Id.* ¶ 25. These technologies (which include the anti-cheat system known as "Ricochet") detect when players are using third party cheating or hacking software, and prevent unauthorized access to the COD Games by those players. *Id.* It is not possible to play the COD Games' online multiplayer modes without installing Activision's anti-cheat technologies. *Id.* When Activision identifies or detects that a player is using cheating software, the player's account may be suspended or "banned," such that the player may no longer access the game and its remote server. *Id.* ¶ 26.

In order for any hack or cheat software to operate, it must be designed to prevent or avoid detection by Activision's anti-cheat software, such as by concealing itself or by disabling the anti-cheat technology. *Id.* ¶ 27. Otherwise,

Mitchell Silberberg & Knupp LLP

20813487.5

3

the software will be detected and the user will be denied access to the particular game's online multiplayer functionality, and may even be permanently banned from playing the game. *Id.*

**Rothholz and His Activities.** Defendant Ryan Rothholz (known online as "Lerggy") is an individual who resides in Antioch, Tennessee. Complaint ¶ 11. In or about 2021 or 2022, Rothholz first created and distributed a software product for certain of the COD Games called "Lergware." *Id.* ¶ 34. Lergware was designed to enable users to disconnect other players from multiplayer games, crash multiplayer servers, and otherwise harass COD players. *Id.* ¶ 33. In or about 2023, Rothholz updated Lergware so that it would work with Activision's popular games, *Call of Duty: Modern Warfare II* and *Call of Duty: Warzone*. *Id.* ¶ 35. The update resulted in online player "attacks" becoming increasingly frequent, causing some users to post warning messages online. *Id.*

Activision first contacted Rothholz on or about June 1, 2023, when it sent a cease-and-desist letter demanding that he cease any further development and distribution of Lergware. *Id.* ¶ 36. In response, Rothholz represented that he would comply with Activision's demands: "[W]ith the intention to maintain a cooperative spirit and out of respect for Activision Blizzard's intellectual property rights, I have chosen to comply with the cease and desist notice you have issued. I have voluntarily deactivated all the software that you named in your letter." Complaint ¶ 36, 39. He also posted the following statement on Discord:



*Id.* ¶ 38.

Activision subsequently learned that, contrary to his statement, Rothholz did not actually cease developing, distributing, and exploiting his software.  *Id.* ¶ 41. Instead, Rothholz "rebranded" or modified Lergware, changed his online alias, transferred or sold his source code to others (including Defendant Doe 1 a/k/a "Seemo"), and/or began working with individual "resellers" (the other Defendants in this lawsuit) to distribute his software product under a different name, "GameHook."[1]  *Id.* ¶ 41–42.  GameHook was made available for several COD Games, including *Call of Duty: Modern Warfare II, Call of Duty: Modern Warfare III, Call of Duty: Black Ops Cold War,* and *Call of Duty: Black Ops 6.  Id.*

Like Lergware, Gamehook includes "rage cheat" functions that enabled players to disconnect others from COD game servers.  *Id.* ¶ 43.  Additionally, GameHook offers a variety of features that allow players to cheat or gain unfair advantages over other players.  *Id.*  Such features include, without limitation, "aimbots," which cause weapons to automatically hit opponents, and "ESP Bots," which identify opponent positions and allow players to see through walls or other obstacles.  *Id.* GameHook incorporates code from Lergware and was developed, in whole or in part, by Rothholz, with assistance from Defendant Collin Gyetvai.  *Id.* ¶ 44.

In an effort to conceal his involvement with GameHook, Rothholz changed his online alias from "Lerggy" to "Joker."  *Id.* ¶ 45.  However, he continued to use the same Discord account and user ID.  *Id.*  Additionally, instead of selling GameHook directly to end users, Rothholz engaged friends and online community members to act as GameHook "resellers."  *Id.*  These resellers sell GameHook on Rothholz's behalf and retain a portion of the revenue from such sales.  *Id.*

---

[1] Lergware and GameHook are referred to herein collectively as the "COD Hacks."

Mitchell Silberberg & Knupp LLP

20813487.5

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

The harm to Activision from the sale and distribution of the COD Hacks is obvious and manifest.  The COD Hacks disrupt the overall COD game experience, harm Activision's reputation, and prevent Activision's legitimate customers from enjoying the game.  *Id.* ¶ 55(a), (c).  As a result, Activision has lost actual and potential customers.  *Id.*  Activision also has been forced to expend substantial resources attempting to remediate the damage caused by the COD Hacks, such as by creating and releasing updates to the COD Games that counteract the COD Hacks, responding to player complaints, employing personnel to police the games to detect the use of the COD Hacks, and "banning" users who are using the COD Hacks.  *Id.* ¶ 55(b).  The COD Hacks even received significant attention on social media and, on information and belief, has caused players to stop playing or avoid the PC version of *Call of Duty: Black Ops 6*.  *Id.* ¶ 55(c).

**This Lawsuit.**  On May 7, 2025, Activision filed this lawsuit against Rothholz and two other individuals responsible for developing and distributing the COD Hacks: Collin Gyetvai (a/k/a Cid) and Jordan Newcombe Boothey (a/k/a "Aussie").  *See* ECF 1.  On May 15, 2025, the Complaint was personally served on Rothholz via delivery to his mother at his place of residence.  *See* ECF 11.  Activision subsequently filed a proof of service reflecting such delivery.  *Id.*

In response to the Complaint, Rothholz filed versions of the instant motion to dismiss on four separate occasions:  June 5, July 3, August 1, and August 28.  *See* ECF 13, 19, 23, 37.  On August 20, prior to the filing of the most recent motion, counsel for Activision attempted to meet-and-confer with Rothholz to discuss the basis of his Motion.  During this call, Rothholz did not provide any reasoning as to the substance of his motions, but instead stated that he "didn't do 99% of the things" alleged in the Complaint.

Gyetavai and Boothey, the other Defendants in this action, have failed to respond to the Complaint, and the Court has taken their default.  *See* ECF 33, 35.

## III. ROTHHOLZ'S PROCEDURAL CHALLENGES ARE WITHOUT MERIT AND SHOULD BE DENIED.

### A. <u>Service Has Been Properly Effectuated On Rothholz</u>

Although Rothholz has appeared in this action, filed his motion to dismiss on four separate occasions, participated in a pre-filing conference of counsel, and now purports to challenge the merits of the claims against him under Rule 12(b)(6), he apparently contends that the action should dismissed for "insufficient service of process." His argument is legally and factually meritless.

As Rothholz admits, "personal service must be effected in a manner reasonably calculated to apprise the defendant of the action and afford a fair opportunity to respond." Motion, p. 4. More precisely, the Ninth Circuit has held that Rule 4 is a "flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint." *Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th Cir. 1988). There can be no serious dispute that service was procedurally proper, that Rothholz has received adequate and fair notice of this lawsuit, and that Rothholz has had a fair opportunity to respond (in fact, he has had many months to respond). Indeed, Rothholz concedes that a process server visited Rothholz's residence and that his mother "accepted the documents." Motion, p. 3. As a result, service indisputably was proper under Rule 4(e)(2)(B), which provides that an individual may be served in a judicial district of the United States by "leaving a copy of [the summons and of the complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." Fed. R. Civ. P. 4(e)(2)(B).

Rothholz's claim that the process server acted in an "aggressive and intimidating manner" (and thus service was "obtained through intimidation or coercion") is wholly unsupported and, in any event, is irrelevant. Notably, Rothholz apparently concedes that he was ***not present*** when his mother accepted

Mitchell Silberberg & Knupp LLP

20813487.5

the service package, and thus does not have any personal knowledge of what transpired.  Nor has he provided *any* evidence to support his specious claim, such as a sworn declaration or video recording.  The reality is that service was effectuated by a competent process server employed by First Legal, Anthony Burlew, who was required to visit Mr. Rothholz's residence three times because he (or his family) refused to answer the door.  Regardless, even if Mr. Burlew was required to "repeatedly and violently knock[] on the door," Rothholz does not offer any authority (and Activision is aware of no such authority) for the proposition that such purported conduct—which is not illegal or fraudulent—could invalidate a proper service of process.

Finally, Rothholz's reliance on *Slaughter v. Legal Process & Courier Serv.*, 162 Cal. App. 3d 1236 (Ct. App. 1984), for the proposition that "courts do not overlook defects in service that impair a party's right to due to process" (Motion, p. 3) is misplaced.  What *Slaughter* actually says is that "the process server's failure to follow state-prescribed procedures which are proper ***does not constitute a due process violation***."  162 Cal. App. 3d at 1246 (emphasis added).  The bottom line is that the papers were delivered pursuant to Rule 4(e), Rothholz was given proper notice of this proceeding, he had an opportunity to present his defense, and his due process rights have not been violated in any manner.  *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002)((quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (Jackson, J.) (method of service comports with due process when it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

**B.**    **This Court Has Specific Personal Jurisdiction Over Rothholz.**

Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, plaintiffs must only make a "prima facie showing of jurisdictional facts."  *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1108 (9th Cir.2002).  In such

cases, courts look to the plaintiff's pleadings and affidavits, and the allegations in the complaint "must be taken as true." *Id.* Nevertheless, in a cursory, five-sentence "argument" that lacks ***any*** evidentiary support, Rothholz claims that the Court lacks personal jurisdiction over him because he resides in Tennessee (not California) and there is not a "clear connection between the forum [California] and the specific claims at issue." Motion, p. 2. Rothholz appears to misunderstand the law, fails to appreciate the distinction between "general" and "specific" jurisdiction, and ignores the extensive factual allegations set forth in Activision's Complaint, including the numerous jurisdictional allegations set forth in Paragraph 8 of the Complaint.

Activision's personal jurisdiction claim is premised on ***specific*** (not general) jurisdiction. Federal courts properly exercise such specific personal jurisdiction where the defendant demonstrates specific contacts with the forum state. *Dole Food Co., Inc. v. Watts*, 303 F.3d at 1111. This "specific" jurisdiction exists when (1) the defendant purposefully directed his activities at the forum or its residents and (2) the plaintiff's claim arises out of those forum-related activities. *Id.* When these elements are satisfied, the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would be ***unreasonable***. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). As set forth below, both prongs of the specific jurisdiction test have been met, and Rothholz has not even attempted to claim (far less prove) that the exercise of jurisdiction would be unreasonable. To the contrary, courts in this District routinely have found personal jurisdiction to be proper and appropriate in nearly identical situations. *See, e.g., Activision Publishing, Inc. v. EngineOwning UG,* No. CV 22-0051-MWF (JCX), 2023 WL 3272399, at *9 (C.D. Cal. Apr. 4, 2023); *Blizzard Ent., Inc. v. Bossland GmbH,* No. SA CV 16-1236-DOC (KESx), 2017 WL 412262, at *1, *6 (C.D. Cal. Jan. 25, 2017); *Blizzard Ent., Inc. v. Joyfun Inc Co., Ltd.,* CV 19-1582-JVS

(DFMx), 2020 WL 1972284 at *5–6 (C.D. Cal. Feb. 7, 2020); *Riot Games, Inc. v. Suga Pte, Ltd.,* 638 F. Supp. 3d 1102, *1114-1118 (C.D. Cal. 2022).

### 1. Rothholz Purposefully Directed His Activities At California.

To establish "purposeful direction," courts apply the "effects" test derived from *Calder v. Jones*, 465 U.S. 783 (1984). This test "requires that the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix Photo, Inc. v. Brand Techs., Inc*., 647 F.3d 1218, 1228 (9th Cir. 2011)(citing *Calder*, 465 U.S. 783 (1984)). When the action sounds in tort, purposeful direction is the proper analytical framework. *Id.* It is well-established in the Ninth Circuit that jurisdiction may be maintained "even if the defendant never set foot in the forum state." *Burri Law PA v. Skurla*, 35 F.4th 1207, 1213 (9th Cir. 2022). All three prongs easily are met here.

***First,*** Rothholz's creation, distribution, and marketing of the COD Hacks plainly were "intentional acts" under the *Calder* test – that is, they were "actual, physical act[s] in the real world." *CYBERsitter, LLC v. People's Republic of China*, 805 F. Supp. 2d 958, 969 (C.D. Cal. 2011). *See Bossland*, at *4 ("Bossland has created a website through which one can license software. The offering of software for sale on the website is an intentional act.")

***Second,*** Rothholz expressly aimed his conduct at the State of California, since (as alleged) his conduct "indicat[es] an intent or purpose to serve the market in the forum State." *Asahi Metal Indus. Co. v. Sup.Ct*., 480 U.S. 102, 112 (1987). Examples of such conduct include "advertising in the forum' and 'creat [ing], control[ling], or employ[ing] the distribution system that brought its [product] to' the forum." *Hendricks v. New Video Channel Am., LLC*, 2015 WL 3616983, at *6 (C.D. Cal. June 8, 2015).

Activision's undisputed allegations include that Rothholz distributed the COD Hacks in the State of California, advertised and marketed the COD Hacks in

Mitchell
Silberberg &
Knupp LLP

20813487.5

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

the. . .State of California, and communicate[d] directly with users of the COD

Hacks in the…State of California.  Complaint, ¶ 8(b).  Additionally, Activision has

alleged (and Rothholz has ***not disputed***) that he (1) "target[ed] the COD Hacks to

users in. . . the State of California, knowing that a substantial market exists for

their COD Hacks in the United States;" (2) "recruit[ed] individuals in the United

States to distribute the COD Hacks in (and from). . .California by reselling the

COD Hacks to consumers located there;" and (3) "enter[ed] into and continue[s] to

enter into contracts with individuals in the State of California, including contracts

pursuant to which these individuals license from Defendants the right to install and

use the COD Hacks."  *Id.*, ¶ 8(c)-(e).  *See Bossland,* at *5 ("Bossland's Bots have

been widely circulated in the United States, as Bossland has sold almost 100,000

licenses to persons in the United States to use its Bots in the United States.");

*EngineOwning,* at *12 (defendant targeted the forum when it engaged with U.S.

customers on a regular basis); *3DO Co. v. Poptop Software, Inc*., 1998 WL

962202, at *3 (N.D. Cal. Oct. 27, 1998) (personal jurisdiction in California where

Defendants encourage and facilitate users in California and elsewhere to download

infringing software).  Rothholz also does not and cannot dispute that while the

COD Hacks are available in states other than California, he did not prevent the sale

of his software in California, such as by geoblocking California IP addresses or

restricting the sale of the COD Hacks.  *See Lang Van, Inc. v. VNG Corp.,* 40 F.4th

1034, 1041 (9th Cir. 2022) ("Although VNG argues its primary audience is in

Vietnam, VNG released its Zing MP3 in English to the United States.  Absent

release by VNG, this app was not available in the United States. . .VNG chose not

to geoblock access to Lang Van's content on Zing MP3 which would have

restricted the use of Zing MP3 in the United States or elsewhere outside of

Vietnam.")

     Perhaps most critically, there is no dispute that the ***only*** purpose of the COD

Hacks is to harm video games developed and published by Activision in the State

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

of California.  Thus, the COD Hacks were developed and designed to target Activision (a California company) and its products, to devalue the massive investment Activision has made in the COD Games, and to degrade the work of California-based developers, programmers, artists, game designers, software engineers, online security experts, and others who worked on the COD Games.  In other words, the COD Hacks are parasitic in nature, in that they derive value only from the COD Games, and their very existence relies on Activision's continued support for the COD Games, which were created in California, published by a California company, and protected by a California-based internal security team working to prevent individuals such as Rothholz from disrupting the game experience.  As the Court explained in *Bossland,* at *6:

> Bossland's business is parasitic in nature—it functions by piggybacking on Blizzard's sale of its games and undermining the gaming environment Blizzard is seeking to create.  But like a direct competitor, Bossland's actions are pointedly undermining Blizzard's brand and profitability.  Indeed, Bossland's activity is even more intermeshed with Blizzard's business than a direct competitor's would be, as Bossland's products can be used only after a person has already purchased a Blizzard game.  Accordingly, the Court finds that Bossland has expressly aimed its conduct at the forum and that under the effects test Bossland has purposefully directed its conduct at the United States.

*See also EngineOwning,* at *12 ("The Cheating software 'piggybacks' on Plaintiffs game.")

**Third,** Activision suffered harm in California from Rothholz's conduct.  "[A] corporation incurs economic loss, for jurisdictional purposes, in the forum of its principal place of business."  *CollegeSource, Inc. v. AcademyOne,* Inc., 653 F. 3d 1066, 1079 (9th Cir. 2011); *Burri Law,* at 1215 (defendant engages in express aiming when conduct is "for the very purpose of having their consequences felt in the forum state."); *Amini Innovation Corp. v. JS Imports, Inc.,* 497 F. Supp. 2d

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1093, 1106 (C.D. Cal. 2007) (specific jurisdiction "where a plaintiff brings suit in its home forum against an out-of-state defendant, alleging that the defendant engaged in infringing activities knowing that plaintiff was located in the forum.") It obviously was foreseeable, and Rothholz was well aware, that the distribution of the COD Hacks would harm Activision in California, where Activision's headquarters and principal place of business are located. *Bossland,* at *12 ("Here, the injury… is primarily felt in the United States as Plaintiff is based in California.")

### 2. Activision's Claim Arises Out Of Rothholz's Forum-Related Activities.

"The Ninth Circuit employs a 'but for' test to determine whether claims arise out of the defendant's contacts in the forum. . .This prong is satisfied if the plaintiff would not have been injured 'but for' the defendant's conduct directed toward the forum state." *Bossland,* at *6 (*citing Ballard v. Savage,* 65 F.3d 1495, 1500 (9th Cir. 1995) and *United Tactical Sys. LLC v. Real Action Pinball, Inc.,* 108 F. Supp. 3d 733 (N.D. Cal. 2015)).  This test is easily met here:  "If [Rothholz] had not purposefully directed [his] intentional acts (i.e. producing, marketing, and selling the [COD Hacks]) at [this forum], Plaintiff would not have suffered the alleged U.S. injuries such as loss of U.S. revenue and tarnishment of their reputation among U.S. users." *EngineOwning,* at *17.

### 3. The Exercise of Jurisdiction is Not Unreasonable

When the plaintiff establishes the facts necessary to establish specific personal jurisdiction (as Activision established here), the burden then shifts to the defendant to provide compelling reasons why the exercise of jurisdiction would be unreasonable. *Burger King*, 471 U.S. at 477 (1985).  Here, Rothholz has hardly provided *any* reasons why the exercise of jurisdiction would be ***unreasonable***, let alone compelling ones, except to say that he is a resident of Nashville, Tennessee and "[t]he mere fact that Plaintiff is located in California is not enough."  Motion,

p. 2. To the contrary, because Rothholz has purposefully directed his conduct at the State of California, "it is 'presumptively reasonable' for [him] to be called to account for the injuries [he] personally inflicted here." *EngineOwning,* at *17. Regardless, each of the factors that the Ninth Circuit considers in determining reasonableness is met here. *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1021 (9th Cir. 2002). For example:

- Rothholz interjected himself into the California market by targeting a California company and intending to cause it harm. *See Bossland,* at * 6 ("Bossland purposefully interjected itself into the United States by subverting the plaintiff's copyright and selling tens of thousands of licenses to use the Bots in the United States.")

- Rothholz does not claim that defending this action in California would be so burdensome as to deprive him of his due process rights. To the contrary, Rothholz has demonstrated that he is capable of submitting documents electronically to this Court and can conduct conferences via videoconference. *See* Motion, p. 6. *Bossland,* at * 6 ("Modern advances in communications and transportation have significantly reduced the burden of litigating in another country"), *quoting Dole Food,* 303 F.3d at 1114-15. *See also EngineOwning,* at *17 (potential inconvenience does not make out a "'compelling case' that the exercise of personal jurisdiction would be unreasonable.")

- This case primarily concerns the application of federal law, and thus there is no sovereignty conflict or concern. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998) ("Such a conflict is not a concern in this case . . . The federal analysis would be the same in either Illinois or California. In this circumstance, the exercise of jurisdiction by a federal court in California does not implicate sovereignty concerns of Illinois.")

- California maintains a strong interest in providing an effective means of redress for its residents [who are] tortiously injured. *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1489 (9th Cir. 1993).

- This dispute involves a California based company and the majority of the team involved in security, production, and finance are all based in California. Thus, this action is most efficiently and conveniently litigated in California. *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1021 (9th Cir. 2002)("it is also convenient for RIO to litigate in Nevada, its principal place of business and the location of many pertinent documents").

- Rothholz does not identify any alternative forum in which this case may be efficiently or effectively litigated. In fact, none of the other defendants in this action have submitted to jurisdiction in any other forum.

In sum, Rothholz cannot "overcome the strong presumption of reasonableness of the assertion of personal jurisdiction." *Dole Foods,* 303 F.3d at 1117. Accordingly, the Court should deny Rothholz's attempt to evade this Court's personal jurisdiction.

## C.   Venue is Proper In This District.

The federal venue statute provides, in relevant part, that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). The Ninth Circuit has adopted the view that "the locus of the injury" is a relevant factor in determining where a substantial part of the events or omissions occurred. *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1076 (9th Cir. 2001). Accordingly, courts have concluded that, for purposes of venue, a defendant's acts over the internet may constitute "events and omissions" in the venue where their effects are felt.

*Volks USA Inc. v. A2 Hosting, Inc.*, 2016 WL 6808113, at *3 (C.D. Cal. Nov. 16, 2016).  Here, the primary "injury" is the reputational and monetary harm suffered by Activision (including harm to Activision's intellectual property), which have been felt in its Los Angeles headquarters.  Accordingly, venue is proper in the Central District.

## IV.   ACTIVISION HAS SUFFICIENTLY STATED A CLAIM ON WHICH RELIEF CAN BE GRANTED.

A complaint survives a 12(b)(6) motion if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The standard is not that the plaintiff prove the case, or that it show probability; it is enough to show more than a "sheer possibility" of wrongdoing.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Additionally, "[t]he *Twombly* plausibility standard . . .does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017).

Rothholz does not fully articulate the basis for his Rule 12(b)(6) challenge, but instead offers only sweeping platitudes such as "several allegations appear to rely on indirect associations" or "the alleged harms. . .are not pleaded with the specificity necessary."  Motion, p. 5.  However, to the extent Rothholz purports to challenge specific deficiencies with respect to his involvement in the alleged conduct, the nature of the circumvention claims, or the damage allegations, his arguments are baseless.

***First,*** Rothholz seems to argue that because the Complaint includes "usernames," it does not adequately allege a "clear, direct connection between Defendant and the conduct at issue."  Motion, p. 5.  This argument is curious,

because the Complaint specifically alleges that Rothholz is known as "Lerggy" *and* that he "was the developer of the COD Hack known as 'Lergware' and developed or participated in the development of the COD Hack known as 'GameHook.'"  Complaint, ¶ 11.  The Complaint also includes numerous detailed allegations about Rothholz's specific involvement with Lergware and Gamehook, such as that:

- "Rothholz developed and released Lergware in or about 2021 or 2022.  Rothholz made Lergware available for sale (for $25) via his dedicated website.  He also made multiple versions of source code for Lergware (e.g. "Lergware-t7," "Lergware-trainer-t8") available on a software code repository."  Complaint, ¶ 34.

- "[I]n or about 2023, Rothholz updated Lergware so that it would work with Activision's popular games *Call of Duty: Modern Warfare II* and *Call of Duty: Warzone*.  The update resulted in online player "attacks" becoming increasingly frequent, causing some users to post warning messages online."  *Id., ¶* 35.

- "On or about June 1, 2023, Activision sent a cease-and-desist letter to Rothholz advising him that Lergware violated Activision's intellectual property rights.  The letter demanded that Rothholz immediately cease and desist from any further development, sale, or distribution of Lergware."  *Id., ¶* 36.

- "[C]ontrary to his representation that he would comply with Activision's demands, Rothholz did not actually cease developing, distributing, and exploiting COD Hacks. Instead, Rothholz 'rebranded' or modified Lergware, changed his online alias, transferred or sold his source code to others (including Defendant Doe 1 a/k/a "Seemo"), and/or began working with individual

"resellers" to distribute the product under a different name." *Id.,* ¶ 37.

- "Rothholz, with the assistance of Defendants Gyetvai, Boothey, and one or more of the Doe Defendants, developed and distributed a new version of Lergware known as "GameHook." GameHook was made available for several COD Games, including *Call of Duty: Modern Warfare II, Call of Duty: Modern Warfare III, Call of Duty: Black Ops Cold War*, and *Call of Duty: Black Ops 6*." *Id.*, ¶ 42.

- "GameHook includes a set of self-titled 'Toxic' features and functions, including features that enable users to 'kick' or disconnect other players from Activision's multiplayer servers (sometimes referred to as a 'rage' cheat) and/or to crash multiplayer servers. Additionally, GameHook offers a variety of features that allow players to cheat or gain unfair advantages over other players. Such features include, without limitation, 'aimbots,' which cause weapons to automatically hit opponents, and 'ESP Bots,' which identify opponent positions and allow players to see through walls or other obstacles." *Id.,* ¶ 43.

- "Activision has reason to believe that Rothholz, Gyetvai, and Boothey are continuing to distribute or sell the GameHook COD Hacks or other COD Hacks through private channels or via the GameHook Discord server." *Id.,* ¶ 50.

These allegations are more than sufficient to allege "a clear, direct connection between Defendant and the conduct at issue."

***Second,*** Rothholz claims that with respect to the DMCA anti-circumvention claims, "the Complaint does not clearly articulate which specific technological protection measures or access controls were allegedly circumvented, or how such circumvention is attributable to Defendant." Motion, p. 5. Nothing could be

further from the truth.  Paragraphs 25 through 27 specifically describe Activision's anti-cheat technical protection measures, which "help detect when players are using third party cheating or hacking software, and prevent unauthorized access to the COD Games by those players."  Paragraph 52 explains that "in order for any of the COD Hacks, including Lergware or GameHook, to operate with the COD Games, such software necessarily includes technology that primarily is designed to avoid, bypass, evade, or otherwise circumvent Activision's anti-cheat and access control technologies."  These allegations are more than sufficient to state a claim for violation of Section 1201 of the DMCA and to place Rothholz on notice of the nature of the claims against him.  *See MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 953 (9th Cir. 2010) (video game bot software circumvented technological measures that "scan the player's computer RAM and confirm the absence of any bots or cheats" before permitting the player to connect to game servers).[2]

**Third,** Rothholz claims that the alleged harms "are not pleaded with the specificity necessary to demonstrate causation or traceability to Defendant's alleged actions."  Motion, p. 5.  This is simply false.  Activision specifically alleged that ***as a direct result of Rothholz's actions*** (i.e. the creation and distribution of the COD Hacks), it cannot deliver its intended player experience,

---

[2]  Rothholtz' reference to the Computer Fraud and Abuse Act ("CFAA") is misplaced, because that statute does not require "circumvention."  Rather, it prohibits a defendant from "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing]. . . information from any protected computer" *or* "knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(2)(C).  *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065–66 (9th Cir. 2016).  Activision sufficiently alleged that Activision's COD servers are 1) protected computers as defined by the CFAA and 2) that Rothholz both personally accessed and encouraged others to access Activision's servers without authorization.  *See Facebook, Inc.*, 844 F.3d at 1067-8 (9th Cir. 2016)(finding liability under CFAA where defendant received a cease and desist letter and knew that it no longer had authorization to access Facebook's computers, but continued to do so anyway).

has suffered a loss of players and player revenues, has been forced to spend time and resources responding to player complaints and updating its game, and has lost customer goodwill.  Complaint, ¶ 55.  In fact, Activision even alleged that Rothholz's GameHook COD Hack "has been so frustrating to COD players that it received significant attention on social media and…has caused players to stop playing or avoid the PC version of *Call of Duty: Black Ops 6*."  *Id.*  This is more than sufficient to state a claim.  *See Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 497 (9th Cir. 2019) (plaintiff stated a claim by alleging that no authorized reason justified Defendant's actions, which directly harmed her)

## CONCLUSION

For the foregoing reasons, Activision respectfully requests that this court deny Rothholz's Motion.

DATED: OCTOBER 15, 2025        MARC E. MAYER
                               MARK C. HUMPHREY
                               MITCHELL SILBERBERG & KNUPP LLP

                               By: *Hannah G. Shepherd*
                                   Marc E. Mayer (SBN 190969)
                                   Mark C. Humphrey (SBN 291718)
                                   Hannah G. Shepherd (SBN 347611)
                                   Attorneys for Activision Publishing, Inc.

## __CERTIFICATE OF COMPLIANCE__

The undersigned, counsel of record for Activision Publishing, Inc., certifies that this brief contains 6,198 words, which:

☑ complies with the word limit of L.R. 11-6.1. OR

Dated: October 15, 2025

By: *Hannah G. Shepherd*

Hannah G. Shepherd