UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC.,<br><br>                          Plaintiff,<br><br>          v.<br><br>RYAN ROTHHOLZ, also known as LERGGY, also known as LERG, also known as LERGSTER, also known as THE PIMP, also known as JOKER0699; also known as JOKER; COLIN GYETVAI, also known as CID, also known as COLLINONDEX; JORDAN NEWCOMBE BOOTHEY, also known as BOSSNIGHT55, also known as AUSSIE; DOE 1, also known as Seemo; DOE 2, also known as CEO, also known as wndprochandler, also known as 8485; and DOES 3 through 10, inclusive,<br><br>                          Defendants. | Case No. 2:25-cv-04075-SPG-BFM<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION, IMPROPER VENUE, INSUFFICIENT SERVICE OF PROCESS, AND FAILURE TO STATE A CLAIM [ECF NO. 37]** |

Before the Court is Defendant Ryan Rothholz's ("Defendant") Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, Insufficient Service of Process, and Failure to State a Claim, (ECF No. 37 ("Motion")). The Court has read and considered the matters raised with respect to the Motion and concluded that this matter is suitable for

decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court DENIES the Motion.

## I.    BACKGROUND

### A.    Factual Background

The following facts are as alleged in the Complaint. (ECF No. 1 ("Compl.")). Plaintiff Activision Publishing, Inc. ("Plaintiff") owns and publishes a series of video games known as "Call of Duty" (the "COD Games"). (*Id.*). Plaintiff alleges that Defendant and co-Defendants Collin Gvetvai, Jordan Newcombe Boothey, Doe 1, also known as Seemo, and Doe 2, also known as CEO (together, "Named Defendants") unlawfully developed, distributed, and sold software products known as "Lergware" and "GameHook" (together, the "COD Hacks") that are "designed to disrupt, alter, or impair the functioning of the COD Games and their multiplayer servers," "with the deliberate intent to harm [Plaintiff], its businesses, and its player community." (*Id.* ¶¶ 1, 2, 4).

#### 1.    The COD Games

The COD Games are a collection of more than eighteen video games across various video game platforms that have been released annually since 2003. (*Id.* ¶¶ 19, 20). These are "first-person shooter" games, in which players role play as soldiers and combat operators in various historical, modern day, and future fictional narratives. (*Id.* ¶ 21). Nearly all COD Games include a "single player campaign story mode[]," and all COD Games provide a "competitive online multiplayer" experience, "where players join online to play together in real-time." (*Id.*). In these multiplayer modes, players compete against each other "to earn experience points, increase their rankings and statistics, and acquire various rewards for winning matches and achieving certain goals and objectives." (*Id.*).

According to Plaintiff, the COD Games are quite popular, with hundreds of millions of copies sold to date, and its popularity is partially attributable to Plaintiff's technical and contractual efforts to ensure the integrity of the COD Games and prevent cheating, disruption, or hacking of multiplayer servers during gameplay. (*Id.* ¶¶ 20, 23, 24). For

example, Plaintiff employs "anti-cheat and other online security technologies," which "help detect when players are using third party cheating or hacking software and prevent unauthorized access to the COD Games by those players." (*Id.* ¶ 25). Players are required to install this technology to play the online multiplayer game mode and, if the software detects that a player is using cheating software, that player's account could be suspended or permanently banned from playing the game. (*Id.* ¶¶ 25–27).

Plaintiff also enters into agreements with players of the COD Games. (*Id.* ¶¶ 28–31). For instance, players must "expressly assent" to Plaintiff's Terms of Use, among other agreements, which grants players a "personal, limited, non-exclusive license" conditioned on compliance with the agreement. (*Id.* ¶ 29). One provision in the Terms of Use requires players to not "use, develop, host or distribute cheats, automation software (bots), modded lobbies, hacks, mods or any other unauthorized third-party software in connection with [Plaintiff's] games or engage in any form of cheating, boosting, or booting." (*Id.*). Players must also comply with the Code of Conduct when playing the COD Games and "compete with integrity." (*Id.* ¶ 30). Under the Code of Conduct, "cheating and griefing or other threats to fair play will not be tolerated," "the use of cheats, including third-party software, is unacceptable," and "engaging in any activity that grants an unfair advantage is considered cheating." (*Id.*).

### 2.    The COD Hacks

Plaintiff alleges that its efforts to protect the integrity of the COD Games are particularly important because individuals attempt to capitalize from the Games' success, and "seek to exploit the games for their own personal gain and profit by selling cheats, hacks, and other malicious software." (*Id.* ¶ 24). As discussed below, Plaintiff alleges that Defendant is among these individuals based on Defendant's development and release of the Lergware and GameHook software.

#### a)    *Lergware*

According to Plaintiff, around 2021 or 2022, Defendant developed and released a COD Hack known as "Lergware." (*Id.* ¶¶ 2, 33, 34). Lergware was software designed for

use in the COD Games, and enabled its users to kick out other players from multiplayer games without their knowledge or consent by "causing them to lose their connection to the COD Games or cause their COD Games' software to crash or stop working." (*Id.* ¶ 33). Defendant made Lergware available for sale on a dedicated website for $25, and he also made various versions of the code available on a software code repository. (*Id.* ¶ 34).

On or about June 1, 2023, Plaintiff sent Defendant a cease-and-desist letter asserting that Lergware violated Plaintiff's intellectual property rights, and "demanded that [Defendant] immediately cease and desist from any further development, sale, or distribution of Lergware." (*Id.* ¶ 36). According to the Complaint, Defendant first responded by posting the letter to an online Discord community[1], and on or about June 7, 2023, also posted the following message on his X profile: "Dear customers, lergware staff have received a cease and desist from activision blizzard and will be shutting down our operation in order to comply. Thanks to all of our customer for being so great!" (*Id.* ¶¶ 37, 38). On or about June 12, 2023, Defendant emailed Plaintiff the following message:

> I hope this message finds you well. I am writing in response to your letter received on Tuesday, June 6th, 2023, alleging infringement of Activision Blizzard Inc.'s intellectual property rights
>
> Firstly, I want to clarify that this email should not be interpreted as an acknowledgment of your claim, nor an admission of guilt on my part.
>
> However, with the intention to maintain a cooperative spirit and out of respect for Activision Blizzard's intellectual property rights, I have chosen to comply with the cease and desist notice you have issued. I have voluntarily deactivated all the software

---

[1] Discord is an instant messaging social platform popular with those playing online video games. *See In re Path Network, Inc.*, 703 F. Supp. 3d 1046, 1076 (N.D. Cal. 2023) (describing Discord).

that you named in your letter.  This action was taken not as an
acceptance of liability but as a gesture of goodwill.

(*Id.* ¶ 39).

Plaintiff understood this email to be Defendant's confirmation of compliance with the June 1, 2023, cease-and-desist letter.  (*Id.* ¶¶ 39–40).

### b)    *GameHook*

Despite Defendant's representations in his June 12, 2023, email, Plaintiff alleges that Defendant, operating under an alias, modified Lergware and distributed it under a different name.  (*Id.* ¶ 41, 42, 45).  Working with at least some of the other Named Defendants, Defendant developed a new version of Lergware known as "GameHook" that was made available for COD Games such as *Call of Duty: Modern Warfare II*, *Call of Duty: Modern Warfare III*, *Call of Duty: Black Ops Cold War*, and *Call of Duty: Black Ops 6*.  (*Id.* ¶ 42). Like Lergware, GameHook enabled its users to kick out other players from multiplayer games without their knowledge or consent and crash multiplayer servers.  (*Id.* ¶ 43). GameHook also provided a variety of features that allowed its users to cheat in the COD Games through functions that caused weapons to automatically hit opponents, identified opponent positions, and allowed players to see through in-game walls or obstacles.  (*Id.*).

According to Plaintiff, co-Defendants Gvetvai, Boothey, and an individual known as "Skysserpent," among others, sold GameHook on public websites and online storefronts on Defendant's behalf.  (*Id.* ¶¶ 45, 46).  GameHook was offered for sale "for at least $50.00 per COD Game and up to $375 for lifetime access to a master key to use all GameHook versions for all supported COD Games."  (*Id.* ¶ 46).  Plaintiff alleges that "hundreds, if not thousands," of individuals purchased GameHook, and more than a thousand players of *Call of Duty: Black Ops 6* have been impacted by the software features.  (*Id.* ¶¶ 46, 47).

In March 2025, Plaintiff sent cease-and-desist letters to Defendants Rothholz, Gyetvai, Boothey, and to Skysserpent.  (*Id.* ¶ 48).  In mid-March 2025, Gyetvai, Boothey, and Skysserpent closed their online storefronts.  (*Id.* ¶ 49).  Though these online storefronts are closed, Plaintiff alleges that it has reason to believe that Named Defendants are

continuing to distribute GameHook and intend to rebrand GameHook or release a similar COD Hack under a different title with different online aliases.  (*Id.* ¶¶ 50, 51).

**B.    Procedural History**

On May 7, 2025, Plaintiff brought this action against the Named Defendants,[2] asserting four causes of action: (1) trafficking in circumvention devices, in violation of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201; (2) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; (3) intentional interference with contractual relations; and (4) unfair competition.  (*Id.*).  Plaintiff requests remedies against the Named Defendants, including preliminary and injunctive relief, actual or maximum statutory damages, exemplary and punitive damages, restitution, and imposition of a constructive trust.  (*Id.* at *Prayer for Relief*).

On May 27, 2025, Plaintiff filed a proof of service executed upon Defendant, attesting that Defendant was served on May 15, 2025.  (ECF No. 11).  On June 5, 2025, Defendant, representing himself, moved to dismiss the Complaint for lack of personal jurisdiction and improper venue, (ECF No. 13), and moved to transfer venue to the Southern District of New York, (ECF No. 14).  Both motions were struck for non-compliance with the Local Rules, (ECF No. 17).  On July 3, 2025, Defendant again moved to transfer venue to the Southern District of New York, (ECF No. 18), and moved to dismiss for lack of personal jurisdiction and improper venue, (ECF No. 19).  These two motions were also struck for non-compliance with the Local Rules.  (ECF No. 22).  On August 1, 2025, Defendant once again moved to dismiss for lack of personal jurisdiction, improper venue, insufficient service of process, and failure to state a claim, (ECF No. 23), which the Court struck as non-compliant with the Local Rules, (ECF No. 27).

---

[2] Of the Named Defendants, only Defendant has appeared in the case.  Since filing proofs of service on all Named Defendants, Plaintiff has obtained entry of default as to Defendants Collin Gvetvai and Jordan Newcombe Boothey.  *See* (ECF No. 33 (entry of default as to Defendant Collin Gvetvai)); (ECF No. 35 (entry of default as to Defendant Jordan Newcombe Boothey)).

Defendant filed this instant Motion on August 28, 2025. (Mot.). Plaintiff filed an Opposition on October 15, 2025. (ECF No. 45 ("Opp.")). Defendant filed a Reply on October 23, 2025. (ECF No. 46 ("Reply")).

## II.  DISCUSSION

Defendant moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process, Rule 12(b)(3) for improper venue, Rule 12(b)(2) for lack of personal jurisdiction, and Rule 12(b)(6) for failure to state a claim. (Mot. at 1). The Court addresses each argument in turn.

### A.  Rule 12(b)(5): Insufficient Service of Process

The Court first finds that Plaintiff has satisfied its burden to show that it served Defendant.

#### 1.  Legal Standard

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital It'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987). A defendant may challenge the "mode of delivery" of the summons and complaint by filing a Rule 12(b)(5) motion. *Cohen v. Bokor*, No. 2:24-cv-03118-CAS-AJR, 2024 WL 3330560, at *2 (C.D. Cal. July 8, 2024). In response to a challenge to the sufficiency of service of process, the plaintiff "bears the burden" of establishing its adequacy under Rule 4. *Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004) (citing 4A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1083 (3d ed. 2002 & Supp. 2003)). If the plaintiff is unable to satisfy this burden, the district court has discretion to either dismiss the action or retain the action and quash the service of process. *Stevens v. Sec. Pac. Nat'l Bank*, 538 F.2d 1387, 1389 (9th Cir. 1976). Courts "must" consider evidence outside the complaint to resolve a motion to dismiss under Rule 12(b)(5). *Cohen*, 2024 WL 3330560, at *2.

Rule 4(e) provides that, "[u]nless federal law provides otherwise, an individual— other than a minor, an incompetent person, or a person whose waiver has been filed—may be served in a judicial district of the United States by . . . leaving a copy of [the summons

and of the complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who lives there." Fed. R. Civ. P. 4(e)(2)(B). Service of process must comply with due process and be "notice reasonably calculated to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *S.E.C. v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Service of process contravenes due process principles when "induced by artifice or fraud." *Esebag v. Whaley*, No. 18-cv-8446-R, 2018 WL 8131221, at *1 (C.D. Cal. Dec. 10, 2018) (quoting *Com. Mut. Acc. Co. v. Davis*, 213 U.S. 245, 256 (1909)).

### 2. Analysis

According to an affidavit by a process server filed in this case, on May 27, 2025, at 9:57 a.m. CDT, a Jane Doe who was 50 years old and a "co-occupant" at Defendant's address received, among other documents, a summons in a civil action and the Complaint. (ECF No. 11 at 5). Based on the affidavit, Plaintiff has shown that Defendant was properly served under Rule 4(e)(2)(B).

Defendant's Motion does not contest that the address where the summons and Complaint were served was incorrect or that he did not receive the summons or the Complaint. Defendant instead argues that service was improper because the process server was loud and aggressive, "repeatedly and violently knocked on the door" and, consequently, Defendant's mother accepted service on his behalf "through intimidation and coercion." (Mot. at 3–4). However, these assertions do not demonstrate service upon Defendant was "induced by artifice or fraud." *Esebag*, 2018 WL 8131221, at *1.

Defendant's citation to *Slaughter v. Legal Process & Courier Serv.*, 162 Cal. App. 3d 1236 (Ct. App. 1984) to suggest alleged defects in service impaired his right to due process is also misplaced. *See* (Mot. at 4 (stating *Slaughter* "reflects the broader principle that courts do not overlook defects in service that impair a party's right to due process")). In that case, the appellant, Slaughter, appealed from the grant of summary judgment in favor of the defendant, a process server, on Slaughter's claim asserting the process server

and others had violated Slaughter's due process rights by improperly serving Slaughter and subsequently signing a false affidavit of service, which resulted in a default judgment being entered against Slaughter. *Slaughter*, 162 Cal. App. 3d at 1243. On appeal, the appellate court considered whether a process server violates a named defendant's due process rights by failing to follow statutory procedures for service of process and then signing a false affidavit. *Id.* at 1245. The court pointed out that Slaughter had not alleged the statutory procedures for service of process were deficient and further noted that he had successfully availed himself of the opportunity to have the default judgment set aside. *Id.* The court thus held that "the process server's failure to follow state-prescribed procedures which are proper does not constitute a due process violation." *Id.* at 1245–46.

Here, as was the case in *Slaughter*, Defendant has not argued that the established statutory procedures for service of process are deficient. Further, Defendant has received notice of this action and availed himself of the opportunity to present his objections to service via the Motion. Thus, he has been afforded the process due under Rule 4, *see Ross*, 504 F.3d at 1138, and fails to demonstrate a due process violation. The Court therefore DENIES Defendant's Motion to Dismiss for insufficient service of process under Rule 12(b)(5).

### B.    Rule 12(b)(2): Lack of Personal Jurisdiction

####          1.    Legal Standard

"Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). When such a motion "is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). Though a plaintiff may not "simply rest on the bare allegations of its complaint," "uncontroverted allegations in the complaint must be taken as true" and "conflicts between parties over

1  statements contained in affidavits must be resolved in the plaintiff's favor."
2  *Schwarzenegger*, 374 F.3d at 800 (internal quotation marks and citations omitted).

3      A district court may exercise personal jurisdiction over a nonresident defendant in a
4  manner that is consistent with due process. *Mavrix Photo, Inc.*, 647 F.3d at 1223. When
5  there is no applicable federal statute governing personal jurisdiction, "the district court
6  applies the law of the state in which the district court sits." *Herbal Brands, Inc. v.*
7  *Photoplaza, Inc.*, 72 F.4th 1085, 1089 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024);
8  *see also* Fed. R. Civ. P. 4(k)(1)(C) ("Serving a summons . . . establishes personal
9  jurisdiction over a defendant . . . when authorized by a federal statute.").

10     As relevant here, California's long-arm statute provides that "[a] court of this state
11  may exercise jurisdiction on any basis not inconsistent with the Constitution of this state
12  or of the United States." Cal. Civ. Proc. Code § 410.10. It "provides for personal
13  jurisdiction to the maximum extent that the Fourteenth Amendment's Due Process Clause
14  allows." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 750 (9th Cir. 2025) (citing Cal. Civ. Proc.
15  Code § 410.10). "Because California's long-arm jurisdictional statute is coextensive with
16  federal due process requirements, the jurisdictional analyses under state law and federal
17  due process are the same." *Schwarzenegger*, 374 F.3d at 800–01. "For a court to exercise
18  personal jurisdiction over a nonresident defendant, that defendant must have at least
19  'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not
20  offend traditional notions of fair play and substantial justice.'" *Id.* at 801 (quoting *Int'l*
21  *Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Minimum contacts may be established
22  via general jurisdiction or specific jurisdiction. *See id.* at 801–02. General jurisdiction
23  exists where the defendant's contacts with the forum state "are so continuous and
24  systematic as to render them essentially at home in the forum state." *Goodyear Dunlop*
25  *Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks and
26  citation omitted). Specific jurisdiction exists when the plaintiff's claims or causes of action
27  "arise out of or relate to" the defendant's contacts with the forum state. *See Burger King*
28  *Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation omitted).

2.    <u>Analysis</u>

Defendant first argues that the Court lacks general and specific jurisdiction over the case.  According to Defendant, he is a resident of Tennessee, not California, and therefore is not subject to general jurisdiction in California.  (Mot. at 2).  In addition, Defendant argues that Plaintiff has failed to show that Defendant's allegedly improper conduct was directed toward the state of California, particularly because the alleged actions occurred "entirely outside the forum." (*Id.*); (Reply at 1).

In response, Plaintiff does not dispute that the Court lacks general jurisdiction over Defendant.  Instead, Plaintiff argues that the Court may exercise specific jurisdiction over Defendant because Defendant intentionally distributed and marketing the COD Hacks to California consumers, communicated directly with users of the COD Hacks in California, and developed and designed the COD Hacks to harm video games developed and published by Plaintiff in California, as well as to devalue the work of other California-based contributors.  (Opp. at 16–17).  The Court agrees with Plaintiff.

Whether a forum state may assert specific personal jurisdiction over a nonresident defendant depends on "the relationship among the defendant, the forum, and the litigation." *Briskin,* 135 F.4th at 750.  Courts analyze specific personal jurisdiction under a three-part test: (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable. *Id.* at 750–51 (quoting first *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014), then citing *Schwarzenegger*, 374 F.3d at 802).

Accordingly, Plaintiff bears the burden to show: (1) Defendant purposefully directed his activities at California; and (2) Plaintiff's claims are related to Defendant's California-related activities. *Mavrix Photo, Inc.*, 647 F.3d at 1228.  Once Plaintiff makes this showing,

the burden shifts to Defendant to "set forth a compelling case that the exercise of jurisdiction would not be reasonable." *Id.* (citing *Burger King Corp.*, 471 U.S. at 476–78).

### a)    Purposeful Direction

Courts generally employ the "purposeful direction" analysis for "claims sounding in tort," such as the claims asserted by Plaintiff. *Briskin*, 135 F.4th at 751. Specific jurisdiction exists where a plaintiff files suit in its home state against an out-of-state defendant and alleges that defendant intentionally infringed its intellectual property rights knowing the plaintiff was located in the forum state. *See Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998). Plaintiff must show that Defendant "(1) commit[ed] an intentional act, that is (2) expressly aimed at the forum state, and (3) which causes harm that the defendant knows will be suffered in that forum state." *Briskin*, 135 F.4th at 751. The central inquiry is the second prong: "the determination of when internet contacts between a defendant and a given forum state are sufficient to show aiming at that forum state." *Id.* at 752.

### (1)    Intentional Act

First, Plaintiff has established that Defendant committed an intentional act when he created, distributed, and marketed the COD Hacks. Plaintiff alleges Defendant "developed and released Lergware in or about 2021 or 2022," and made it "available for sale (for $25) via his dedicated website" and "available on a software code repository." (Compl. ¶ 34). Plaintiff also alleges that Defendant "developed and distributed a new version of Lergware known as 'GameHook'" after Defendant was sent a cease-and-desist letter, and GameHook was available for several COD Games, such as *Call of Duty: Modern Warfare II*, *Call of Duty: Modern Warfare III*, *Call of Duty: Black Ops Cold War*, and *Call of Duty: Black Ops 6*. (*Id.* ¶ 42). Plaintiff's allegations are sufficient to show the development and distribution of COD Hacks involved intentional acts. *See Blizzard Ent., Inc. v. Bossland GmbH*, No. 16-cv-1236-DOC-KES, 2017 WL 412262, at *4 (C.D. Cal. Jan. 25, 2017) (finding, on a motion to dismiss for lack of personal jurisdiction, that "[t]he offering of software for sale on the website is an intentional act").

(2)    *Expressly Aimed*

Second, Plaintiff has shown that Defendant's creation, distribution, and marketing of the COD Hacks individually targeted Plaintiff, and thus was expressly aimed at California.

"Not all material placed on the Internet is, solely by virtue of its universal accessibility, expressly aimed at every state in which it is accessed." *Mavrix Photo, Inc.*, 647 F.3d at 1231. Though express aiming does not require differential targeting toward a forum state or individual treatment, *Briskin*, 135 F.4th at 757–58, in the context of virtual contacts through websites with a national market, there must be "something more" to confer jurisdiction, *Mavrix Photo, Inc.*, 647 F.3d at 1229. "Something more" is evaluated based on several factors, including "the interactivity of the defendant's website," "the geographic scope of defendant's commercial ambitions," and "whether the defendant individually targeted a plaintiff known to be a forum resident." *Briskin*, 135 F.4th at 757–58. The Ninth Circuit has held that "an interactive platform expressly aims its wrongful conduct toward a forum state when its contacts are its own choice and not random, isolated, or fortuitous, even if that platform cultivates a nationwide audience for commercial gain." *Id.* at 758 (internal quotation marks and citation omitted). For example, a German defendant expressly aimed its conduct at California when it developed and distributed software designed to allow players to cheat in games developed by a California-based plaintiff, thus individually targeting the plaintiff. *Blizzard Ent., Inc.*, 2017 WL 412262, at \*5–\*6. In comparison, a defendant who uploaded a video onto a public YouTube channel, without evidence that the channel had a California focus, California user base, or California specific advertisements, did not "expressly aim" his conduct toward California. *Barkley & Assocs., Inc. v. Brunshidle*, No. 25-cv-03576-MWF-JPR, 2025 WL 2946906, at \*4 (C.D. Cal. Sept. 10, 2025).

Here, the Court finds the *Blizzard Ent., Inc.* example persuasive and analogous to the facts alleged in the Complaint. Like the defendant in *Blizzard Ent., Inc.*, Plaintiff alleges that Defendant intentionally targeted Plaintiff when he created, distributed, and

marketed the COD Hacks, and such conduct was therefore expressly aimed at California. *E.g.* (Compl. ¶ 8). Additionally, Plaintiff alleges that the COD Hacks were designed specifically for use in the COD Games. (*Id.* ¶¶ 1, 33, 35). These allegations, which are largely uncontroverted by contrary facts, are sufficient to show that Defendant knew the COD Games were owned by Plaintiff, a corporation with its principal place of business in California. Further, like the defendant in *Blizzard Ent., Inc.*, the Complaint alleges facts to show that Defendant's business of developing and distributing the COD Hacks is "parasitic in nature," as it "functions by piggybacking on [Plaintiff's] sale of its games and undermining the gaming environment [Plaintiff] is seeking to create." *Blizzard Ent., Inc.*, 2017 WL 412262, at *6. Plaintiff's allegations are therefore sufficient to demonstrate that Defendant intentionally created, distributed, and marketed the COD Hacks for use in the COD Games, that these actions were not "random, isolated, or fortuitous," and that these actions targeted Plaintiff in California.

Citing to *Walden v. Fiore*, *Axiom Foods v. Acerchem International, Inc.*, and *Picot v. Weston*, Defendant argues that Plaintiff "identifies no conduct by Defendant directed toward California itself. According to Defendant, the alleged actions occurred entirely outside the forum, and the only asserted nexus is Plaintiff's own location in California," which is insufficient to confer specific jurisdiction. (Reply at 2 (citing first 571 U.S. at 277, then citing 874 F.3d 1064 (9th Cir. 2017), then citing 780 F.3d 1206 (9th Cir. 2015))). However, based on the facts alleged in the Complaint, neither *Walden*, *Axiom Foods*, nor *Picot* compel a different result.

First, the Supreme Court in *Walden* explicitly declined to address the question of minimum contacts for intentional torts "committed via the Internet or other electronic means." *Walden*, 571 U.S. at 290 n.9. In addition, *Walden* stands for the principle that a personal jurisdiction analysis focuses on a defendant's contacts with the state, not with a resident of the forum. *Id.* at 288. The plaintiffs were Nevada residents who sought to bring a case against a defendant in Nevada for actions that took place in Georgia. *Id.* at 288–89. Having no previous connection to Nevada, other than the contacts with the Nevada

plaintiffs, the defendant thus could not be subject to personal jurisdiction in Nevada. *Id.* *Walden* affirms that "an injury is jurisdictionally relevant insofar as it shows that the defendant has formed a contact with the forum state. The proper question is . . . whether the defendant's conduct connects him to the forum state in a meaningful way." *Id.* at 290. Here, Defendant's conduct did not "occur[] entirely outside the forum," as he suggests, nor is the location of Plaintiff's headquarters the sole basis for jurisdiction. *See* (Reply at 2–3). According to the Complaint, Defendant deliberately reached out beyond his home state of Tennessee and created a product that targeted Plaintiff's COD Games, sold the COD Hacks to California residents, and made the COD Hacks available to California residents through his website and a software code repository. (Compl. ¶¶ 8, 34). Though Defendant was not physically in California during the period of the alleged conduct, the effects of this conduct were felt within California, making specific jurisdiction proper. *See Walden*, 571 U.S. at 288.

The facts of *Axiom Foods* and *Picot* also are not analogous to the conduct alleged in the Complaint. In *Axiom Foods*, for example, the Ninth Circuit held that a United Kingdom-based newspaper's contacts with the United States, which were limited to a newsletter that was sent to 70 recipients with companies in the United States, without an explanation of the relationship between the recipients and the companies, was "scant, fleeting, and attenuated," and thus insufficient to confer jurisdiction under Rule 4(k)(2). 874 F.4th at 1072. The Ninth Circuit similarly held in *Picot* that jurisdiction over a contract dispute in California was inappropriate because the conduct relevant to the dispute, such as contract negotiations, the parties' course of dealing, and contemplated future actions, took place outside of the state. 780 F.3d at 1212–13. Whereas here, Plaintiff alleges that Defendant intentionally created the COD Hacks, specifically targeting Plaintiff, the owner and publisher of the COD Games in California, and distributed the COD Hacks to individuals within California, as well as throughout the United States. (Compl. ¶ 1, 8). Plaintiff has thus alleged sufficient facts to establish the connection between Defendant, Defendant's alleged conduct, and California-based individuals who bought the COD

Hacks. *See* (*id.* ¶ 8). It was therefore not "random, isolated, or fortuitous" that Defendant sold the COD Hacks to individuals in the state of California because it was well within "the geographic scope of [his] commercial ambitions." *Briskin*, 135 F.4th at 758 (internal quotation marks and citations omitted). In sum, Plaintiff has shown that Defendant's conduct was expressly aimed at California.

### (3)    *Harm Suffered*

Third, it was foreseeable that the harm of Defendant's alleged conduct to Plaintiff would be suffered in California. "[A] corporation can suffer economic harm both where the bad acts occurred and where the corporation has its principal place of business." *Mavrix Photo, Inc.*, 647 F.3d at 1231. "The importance of this requirement is not the magnitude of the harm, but rather its foreseeability." *Entrepreneur Media v. Entrepreneur*, 8:21-cv-00390-JVS-ADS, 2021 WL 4497891, at *8 (C.D. Cal. July 14, 2021) (citing *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir. 2006)).

Here, Plaintiff has alleged sufficient facts to demonstrate that the injury suffered by Plaintiff—loss of revenue and damage to Plaintiff's reputation—was felt primarily in California, where Plaintiff's headquarters and principal place of business are located. (Opp. at 17–18). Plaintiff has also alleged that, based on previous cease-and-desist letters it sent to Defendant regarding the COD Hacks, Defendant knew that the harm was likely to be suffered in California.

In sum, the Court finds that Defendant expressly aimed his conduct at California under the purposeful direction test.

### b)    *Arising Out of*

To determine whether Plaintiff's claims arise out of or result from Defendant's activities, the Court applies the "but for" test. *See Panavision Int'l, L.P.*, 141 F.3d at 1322 (citation omitted). In other words, but for Defendant's conduct directed at California, Plaintiff would not have suffered the injury. Here, Defendant's conduct directed at Plaintiff is the but-for cause of Plaintiff's claims. Had Defendant not allegedly violated Plaintiff's copyright and distributed the COD Hacks in California, Plaintiff would not have claims

against Defendant for a violation of the COD Games copyright based on the distribution of the COD Hacks in California. *See Blizzard Ent., Inc.*, 2017 WL 412262, at *6.

c)    *Fair Play and Substantial Justice*

With the first two requirements satisfied, the burden shifts to Defendant to present a compelling case that the exercise of specific jurisdiction is unreasonable. *See Schwarzenegger*, 374 F.3d at 802. "To evaluate reasonableness, [a court applies] a seven-factor balancing test that weighs: (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*, 905 F.3d 597, 607 (9th Cir. 2018).

Defendant only argues that he "has no meaningful contact with California," and that "[f]orcing Defendant to litigate in California would be unjust, particularly given his limited resources and pro se status." (Mot. at 2). This assertion weighs the second factor, "the burden on the defendant of defending in the forum," in Defendant's favor. However, Defendant has not addressed the other six factors, and thus, has not satisfied his burden to show a compelling case that an exercise of jurisdiction would not be reasonable. *See, e.g.*, *Sheisgracielou, LLC v. McBee Farms, L.C.*, No. 24-cv1479-GPC-AHG, 2024 WL 4847386, at *6 (S.D. Cal. Nov. 19, 2024) ("Weighing the two factors raised by Defendant, the Court concludes that Defendant has failed to a demonstrate compelling case that jurisdiction over it would be unreasonable."). Accordingly, the Motion, insofar as it is based on lack of personal jurisdiction, is DENIED on that ground.

## C.    Rule 12(b)(3): Improper Venue

### 1.    Legal Standard

Federal Rule of Civil Procedure 12(b)(3) allows a party to file a motion to dismiss based on improper venue. Fed. R. Civ. P. 12(b)(3). Plaintiff bears the burden of

establishing proper venue, *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979), and must do so as to each defendant and each claim, *Allstar Mktg. Grp., LLC v. Your Store Online, LLC*, 666 F. Supp. 2d 1109, 1126 (C.D. Cal. 2009). Generally, venue is governed under 28 U.S.C. § 1391. *See* 28 U.S.C. § 1391(a)(1) ("[T]his section shall govern the venue of all civil actions brought in district courts of the United States."). For copyright actions, however, venue is exclusively governed by 28 U.S.C. § 1400(a), and "is not determined by the general provision governing suits in the federal district courts." *Lumiere v. Mae Edna Wilder, Inc.*, 261 U.S. 174, 176 (1923).

In determining whether venue is proper on a motion to dismiss, the court may consider facts outside the pleadings and need not accept the pleadings as true. *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004). Once a court has determined that venue is proper as to one claim, under the doctrine of pendant venue, the court may exercise pendant venue to adjudicate closely related claims. *Therabody, Inc. v. Aduro Prods., LLC*, No. 2:22-cv-00596-RGK-AFM, 2022 WL 3137716, at *1–*2 (C.D. Cal. June 2, 2022). If the court determines that venue is improper, it "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Whether to dismiss or transfer the case is within the sound discretion of the district court. *See King v. Russell*, 963 F.2d 1301, 1304–05 (9th Cir. 1992) (finding that the district court did not abuse its discretion by dismissing an action where the court was not the proper venue).

 2. Analysis

Plaintiff argues that venue is proper in this district under the "locus of the injury" test because the effects of Defendant's alleged conduct were felt in this District. (Opp. at 20–21). Defendant argues that venue is improper under 28 U.S.C. § 1391(b) because the alleged conduct "occurred entirely outside California," but has not argued for transfer to a proper venue. (Reply at 2–3). As venue must be proper for each claim, *Allstar Mktg. Grp., LLC*, 666 F. Supp. 2d at 1126, the Court evaluates each of Plaintiff's claims in turn.

a)    *Venue for the DMCA Claim (Claim 1)*

Section 1400(a) provides that "[c]ivil actions, suits, or proceedings arising under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides or may be found." 28 U.S.C. § 1400(a).  The Ninth Circuit has interpreted "this provision to allow venue in any judicial district where, if treated as a separate state, the defendant would be subject to personal jurisdiction." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1126 (9th Cir. 2010), *rev'd on other grounds, Axiom Foods, Inc.*, 874 F.3d at 1070; *Allstar Mktg. Grp., LLC*, 666 F. Supp. 2d at 1127.

Plaintiff's first claim, trafficking in circumvention devices in violation of the DMCA, is an action relating to copyright, and thus venue must be analyzed under 28 U.S.C. § 1400(a).  *See* 17 U.S.C. § 1201.  As the Court has concluded that Defendant is subject to personal jurisdiction in this district, venue is proper as to Plaintiff's DMCA claim.  *See Allstar Mktg. Grp., LLC*, 666 F. Supp. 2d at 1127.

b)    *Venue for non-copyright claims (Claims 2–4)*

Under 28 U.S.C. § 1391, venue is proper in a judicial district: (1) "in which any defendant resides, if all defendants are residents of the State in which the district is located"; (2) "in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"; or (3) "if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."  28 U.S.C. § 1391(b).  Plaintiff contends that venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred here.  (Opp. at 20–21).

In the Ninth Circuit, determining where a substantial part of the events or omissions occurred may depend on "the locus of the injury," or where the harm was suffered.  *See Myers v. Bennett L. Offs.*, 238 F.3d 1068, 1075–76 (9th Cir. 2001) (venue was proper in Nevada because the harm resulting from an alleged tort of invasion of privacy was felt in

Nevada); *Volks USA Inc. v. A2 Hosting, Inc.*, No. 16-cv-4277-CAS-E, 2016 WL 6808113, at \*2–\*3 (C.D. Cal. Nov. 16, 2016) (venue was proper under § 1391(b)(2) because the harm from defendant's alleged virtual conduct was felt in the Central District of California).

Plaintiff argues that as a result of Defendant's alleged conduct, which give rise to its CFAA, intentional interference with contractual relations, and unfair competition claims, it suffered reputation and monetary harm, as well as harm to its intellectual property, felt in its Los Angeles headquarters in this District. (Opp. at 20–21); (Compl.). Though Defendant argues that his alleged conduct occurred entirely outside California, (Reply at 2–3), Defendant does not assert that the effects of his alleged conduct were not felt in this District. For the purposes of determining venue, Plaintiff has satisfied its burden to show that the effects of Defendant's alleged conduct, such as lost revenue, reputational damage, and expense of resources to respond to the COD Hacks were felt in California. (Compl. ¶ 55). Venue is thus proper in the Central District of California for Claims 2–4, and dismissal is not warranted under 28 U.S.C. § 1406(a).

### D.    Rule 12(b)(6): Failure to State a Claim

#### 1.    Legal Standard

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). To survive a 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not

akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citation omitted). When ruling on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

### 2.    Discussion

Defendant seeks dismissal of the entire action for failure to state a claim, asserting that the Complaint fails to plausibly establish his liability and that the allegations rely on "indirect associations" or "circumstantial context, without a clear, direct connection between Defendant and the conduct at issue." (Mot. at 5).  Defendant raises arguments in favor of dismissal of the DMCA and CFAA claims.[3]  (*Id.*).  Plaintiff opposes the Motion, asserting that it has met the requisite pleading standard.  (Opp. at 21 (citing *Twombly*, 550 U.S. at 544; *Iqbal*, 556 U.S. at 662)).  The Court addresses the sufficiency of the DMCA and CFAA claims in succession.

### a)    Count 1: Trafficking in Circumvention Devices

The DMCA, 17 U.S.C. §§ 1201 *et seq.*, was enacted to provide copyright owners with "effective legal remedies" to pursue those who circumvented copyright protective technological measures. *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 942 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011). The Ninth Circuit interprets the DMCA to "create two distinct types of claims." *Id.* at 944. First, § 1201(a) "prohibits the circumvention of any technological measure that effectively

---

[3] Though the Motion seeks dismissal of the action under Rule 12(b)(6), dismissal of Claim 3, intentional interference with economic relations, or Claim 4, unfair competition, is not supported by any facts or arguments. *See* (Mot. at 5); (Reply at 2–3).  Aside from an assertion that "[t]he Complaint fails to plead sufficient factual content to plausibly establish Defendant's liability under the asserted claims," (Mot. at 5), Defendant offers no support of dismissal for Plaintiff's intentional interference with economic relations or unfair competition claims.  Therefore, the Court DENIES the Motion insofar as it asserts the failure to state a claim as to Claims 3 and 4.

controls access to a protected work and grants copyright owners the right to enforce that prohibition." *Id.* Second, § 1201(b) "prohibits trafficking in technologies that circumvent technological measures that effectively protect a right of a copyright owner." *Id.* In other words, § 1201(a) prohibits circumvention of protective technological measures and the trafficking of devices that facilitate such circumvention, and § 1201(b) protects against copyright infringement. *Id.* at 946. Plaintiff purports to bring a claim under the § 1201(a). (Compl. ¶¶ 58–71); (Opp. at 23–24).

As relevant here, § 1201(a)(2) provides that, "[n]o person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title; (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(2).

To state either claim under the DMCA, Plaintiff must allege that "(i) the work at issue was protected under the Copyright Act, (ii) the copyrighted work was protected by a technological measure, and (iii) the technological measure was circumvented in order to obtain access to the copyrighted work." *iSpot.tv, Inc. v. Teyfukova*, No. 2:21-cv-06815-MEMF-MAR, 2023 WL 3602806, at *4 (C.D. Cal. May 22, 2023) (citing 17 U.S.C. § 1201(a)(1)(A); *MDY Indus., LLC*, 629 F.3d at 944 (internal quotation marks omitted).

Plaintiff has alleged that the COD Games are protected under the Copyright Act. It alleges that it "possesses valid, registered copyrights in each of the COD Games," which include rights in and to the COD Games' computer software, audiovisual works, and screen displays created when the COD Game software interacts with a user's computer, as well as the dynamic non-literal elements created when the COD Game software interacts with online multiplayer game servers. (Compl. ¶ 19).

Plaintiff has also sufficiently alleged that the COD Games were protected by a technological measure. A "technological measure" is an operation, which in its ordinary course, "requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). Plaintiff asserts that it employs "anti-cheat and other online security technologies," which "help detect when players are using third party cheating or hacking software, and prevent unauthorized access to the COD Games by those players." (Compl. ¶ 25). If the technology detects that a player is using cheating software, "the player's account may be suspended or 'banned,' such that the player may no longer access the game or its remote server." (*Id.* ¶ 26). Plaintiff represents that "[i]t is not possible to play the COD Games' online multiplayer modes without installing [Plaintiff's] anti-cheat technologies." (*Id.* ¶ 25).

Drawing reasonable inferences from the allegations of the Complaint, the anti-cheat security technology amounts to a technological measure. Access to the COD Games online multiplayer modes is contingent on the installation of the anti-cheat technologies, without which a player is unable to play the COD Games. *See* (*id.*). Plaintiff's anti-cheat technology is thus plausibly alleged as a technological measure that protects the COD Games. *See* 17 U.S.C. § 1201(a)(3)(B); *Epic Games Inc. v. Araujo*, No. 24-cv-24-10835-KK-JC, 2025 WL 2019810, at *5 (C.D. Cal. June 24, 2025) (recognizing that plaintiff sufficiently alleged that cheat detection software was a technological measure that protected an online multiplayer game). Defendant's assertion that "the Complaint does not clearly articulate which specific technological protection measures or access controls were allegedly circumvented," overlooks these allegations. (Mot. at 5).

Further, given the Complaint's allegations that Defendant trafficked technology designed to circumvent Plaintiff's anti-cheat security technology to obtain access to the COD Games, Defendant's assertion that the circumvention is not attributable to him is unavailing. *See* (*id.* at 5). To "circumvent" a technological measure is "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove,

deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). According to Plaintiff, Defendant developed Lergware and at least participated in developing GameHook, both of which are software products primarily designed to interfere with COD Game Play and marketed these products as such. (Compl. ¶¶ 11, 33, 52, 63). For example, the Complaint alleges GameHook "offers a variety of features that allow players to cheat or gain unfair advantages over other players," such as automatically hitting opponents and allowing players to see through obstacles within the COD Games. (*Id.* ¶ 43). Plaintiff alleges that, "in order for any of the COD Hacks, including Lergware or GameHook, to operate with the COD Games, such software necessarily includes technology that primarily is designed to avoid, bypass, or otherwise circumvent Activision's anti-cheat and access control technologies." (*Id.* ¶ 52). Taken together, Plaintiff has sufficiently alleged Defendant, by developing and distributing Lergware and GameHook, trafficked technology that circumvented Plaintiff's technological measures, in violation of § 1201(a) of the DMCA.

   *b)*    *Count 2: Violation of the Computer Fraud and Abuse Act*

The Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*, was enacted to prevent computer hacking and is "best understood as an anti-intrusion statute," imposing liability for conduct "analogous to breaking and entering." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022) (citing H.R. Rep. No. 98-894, at 20). The CFAA imposes criminal and civil liability on whoever "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer," 18 U.S.C. § 1030(a)(2)(C), and provides a private right of action for those who suffer a damage or loss amounting to at least $5,000.00 during a one-year period as a result. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065–66 (9th Cir. 2016) (citing 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), (g)). "Whoever conspires to commit or attempts to commit an offense" under 18 U.S.C. § 1030(a) is also subject to such liability. 18 U.S.C. § 1030(b).

A complaint sufficiently states a claim for a violation of § 1030(b) when (1) it alleges an underlying wrongful act under § 1030(a); and (2) it contains "specific allegations of an agreement and common activities" in furtherance of the wrongful act. *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 835 (N.D. Cal. 2014); *see also Cool Runnings Int'l Inc v. Gonzalez*, No. 1:21-cv-00974-DAD-HBK, 2021 WL 5331453, at *12 (E.D. Cal. Nov. 16, 2021); *Calendar Rsch. LLC v. StubHub, Inc.*, No. 2:17-cv-04062-SVW-SS, 2020 WL 4390391, at *14, *26 (C.D. Cal. May 13, 2020).

Plaintiff alleges that Defendant "knowingly aided and abetted, conspired with, or otherwise caused players of the COD Games to (a) intentionally access the Game Servers without Activision's authorization and/or (b) knowingly cause the transmission of a program, information, code, or command in order to intentionally cause damage to the Game Servers," in violation of the CFAA.  (Compl. ¶ 74).  Though Plaintiff has not specified in the Complaint which portions of § 1030 it alleges were violated by Defendant, it appears that Plaintiffs are invoking a conspiracy claim under § 1030(b) based on a third-party's unauthorized access of Plaintiff's protected computers under § 1030(a)(5).[45]  *See*

---

[4] As described more fully below, 18 U.S.C. § 1030(a)(5) imposes liability for whoever:

    (A)    knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

    (B)    intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

    (C)    intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

18 U.S.C. §§ 1030(a)(5)(A)–(C).

[5] In its Opposition, Plaintiff argues that Defendant "both personally accessed and encouraged others to access [Plaintiff's] servers without authorization." (Opp. at 24 n.2). However, the Complaint alleges facts to show a CFAA conspiracy and does not allege facts to show that Defendant personally accessed Plaintiff's game servers. *See, e.g.*, (Compl. ¶ 77 ("On information and belief, Defendants have continued to conspire to obtain unauthorized access to or to damage the Game Servers with the intent of harming Activision and will continue to do so unless enjoined.")).  Thus, the Court construes Plaintiff's CFAA claim, as alleged, as a claim under § 1030(b) only.

*In re Intuit Priv. Litig.*, 138 F. Supp. 2d 1272, 1279–80 (C.D. Cal. 2001) (construing allegations for a claim under the CFAA in accordance with applicable statutory provisions). Thus, Plaintiff's claim, properly understood, alleges that Defendant conspired to (a) access Plaintiff's game servers without requisite authorization; and/or (b) transmit software to intentionally cause damage to Plaintiff's game servers. *See* (Compl. ¶¶ 72–77). The Court will therefore evaluate whether Plaintiff has sufficiently stated a claim for conspiracy to violate the CFAA.

### (1)    Section 1030(a)(5)

"There are two threshold requirements for civil liability under any provision of § 1030(a): a defendant must 1) access a protected computer without authorization or exceeding authorization, and 2) the unlawful access must cause some form of either damage or loss." *Calendar Rsch. LLC*, 2020 WL 4390391, at *15 (citing *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1131–32 (9th Cir. 2009)).

Section 1030(e)(2)(B) defines a "protected computer" as an electronic or high speed data processing device "used in or affecting interstate or foreign commerce and communication." 18 U.S.C. § 1030(e)(2)(B). "Authorization," by its plain and ordinary meaning, is defined as "permission or power granted by an authority." *Brekka*, 581 F.3d at 1133. Based on this definition, "authorization" "turns on the decision of the authority that grants—or prohibits—access." *Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178, 1183–84 (N.D. Cal. 2013) (citing *id.* at 1135). As relevant to § 1030(a), a protected computer is accessed "without authorization" if the defendant does not have permission, or permission has been revoked explicitly. *Facebook, Inc.*, 844 F.3d at 1067. In addition, "a violation of the terms of use of a website—without more—cannot establish liability under the CFAA." *Id.* Damage under the CFAA is defined as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

Under § 1030(a)(5) specifically, an individual commits a violation if their conduct: (A) knowingly causes the transmission of a program, information, code, or command, and

as a result of such conduct, intentionally causes damage without authorization, to a protected computer; (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." 18 U.S.C. §§ 1030(a)(5)(A)–(C).

Defendant argues that Plaintiff did not adequately plead that the harm suffered was traceable to Defendant's alleged conduct. (Mot. at 5). For the first time during the Reply, Defendant also asserts that Plaintiff did not revoke authorization to access its servers or games, and only "demanded cessation of certain business activity." (Reply at 3).[6] In its Opposition, Plaintiff argues that the Complaint sufficiently alleges a connection between Defendant, Defendant's username, and his involvement in developing and distributing the COD Hacks. (Opp. at 21–22).

The Court agrees with Plaintiff. As a threshold matter, Defendant does not contest that Plaintiff's Game Servers, as alleged, are "computer servers used by [Plaintiff] to engage in interstate and foreign commerce." (Compl. ¶ 73); *see generally* (Mot. at 5). Plaintiff has alleged that its Game Servers are used or effected in the sale and distribution of the COD Games. (Compl. ¶¶ 19, 20); 18 U.S.C. § 1030(e)(2)(B); *see also Ubisoft, Inc. v. Kruk*, No. 20-cv-478-DMG-AS, 2021 WL 3472833, at *3 (C.D. Cal. July 9, 2021) (recognizing that a video game company's game servers were protected computers under the CFAA because they were "used to engage in interstate and foreign commerce").

In addition, as discussed above, Plaintiff has alleged that Defendant was known online as "Lerggy" and that he developed and distributed Lergware and at least participated in developing GameHook. (Compl. ¶¶ 11, 33, 34, 45). Plaintiff also alleges that "Joker" is an alias of Defendant's because Lerggy and Joker share "the same Discord account and

---

[6] Arguments raised for the first time in the Reply are considered improper, as they may unfairly prejudice the non-moving party and deprive them of an opportunity to respond, and the Court has discretion to decline to consider them. *See Koerner v. Grigas*, 328 F.3d 1039, 1048–49 (9th Cir. 2003); *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

user ID." (*Id.* ¶ 45). In addition, according to the Complaint, Defendant posted about the cease-and-desist letter Plaintiff sent on or about June 1, 2023, confirming that "lergware staff have received a cease and desist from activision blizzard and will be shutting down our operation to comply." (*Id.* ¶¶ 36, 38). The Complaint also describes the damage Plaintiff's game servers suffered because of Lergware and GameHook's operation within the COD Games, such as disconnecting other players from Plaintiff's multiplayer matches or causing Plaintiff's servers to crash. (*Id.* ¶¶ 33, 43). These effects readily amount to an "impairment to the integrity or availability of . . . a program [or] a system." *See* 18 U.S.C. § 1030(e)(8); *see also Ubisoft, Inc.*, 2021 WL 3472833, at *4 (recognizing that software that crashed servers and disconnected players from an online multiplayer game qualified as damage under § 1030(e)(8)). Plaintiff has reasonably alleged that the damage suffered is traceable to Defendant.

Even if Defendant had properly argued that Plaintiff did not revoke authorization to access its servers or games, the allegations of the Complaint belie that argument. Plaintiff, as the owner and publisher of the COD Games, has the authority to authorize access to the COD Games and attendant game servers. *See* (Compl. ¶ 1). It follows that Plaintiff also has the authority to prohibit access to the COD Games and severs. On or about June 1, 2023, and again in March 2025, Plaintiff issued Defendant cease-and-desist letters demanding that he cease development or distribution of COD cheating or hacking software. (*Id.* ¶¶ 36, 48). In response to these cease-and-desist letters, Defendant posted on his X profile that he would be "shutting down [the Lergware] operation to comply," (*id.* ¶ 38), and Defendants Gyetvai and Boothey "shuttered their online storefronts, (*id.* ¶ 49). Taking these facts as alleged, the Plaintiff has plausibly alleged that it revoked Defendant's authorization of the COD Games and game servers by way of the COD Hacks.

### (2)    Section 1030(b)

"In the context of civil conspiracy, to survive a motion to dismiss, plaintiff must allege with sufficient particularity that defendants reached some explicit or tacit understanding or agreement." *NetApp, Inc.*, 41 F. Supp. 3d at 836.

Defendant raises a general argument that "[t]he Complaint fails to plead sufficient factual content to plausibly establish Defendant's liability under the asserted claims." (Mot. at 5). As with his arguments for dismissal of the Intentional Interference with Economic Relations and Unfair Competition claims, dismissal of the § 1030(b) claim is not supported by any facts or arguments. The Court thus DENIES the Motion to Dismiss for Failure to State a Claim as to Claim 2 on this basis.

**III.    CONCLUSION**

For the foregoing reasons, the Court DENIES the Motion to Dismiss.

**IT IS SO ORDERED.**

DATED: February 2, 2026

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE