MARC E. MAYER (SBN 190969)
mem@msk.com
MARK C. HUMPHREY (SBN 291718)
mxh@msk.com
HANNAH SHEPHERD (SBN 347611)
hannah.shepherd@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

MARISSA B. LEWIS (*Pro Hac Vice*)
mbl@msk.com
MITCHELL SILBERBERG & KNUPP LLP
437 Madison Ave, 25th floor
New York, NY 10022
Phone: (212) 509-3900

Attorneys for Activision Publishing, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ACTIVISION PUBLISHING, INC.,

Plaintiff,

v.

RYAN ROTHHOLZ a/k/a "Lerggy," "Lerg," "Lergster," "The Pimp," "Joker0699," and "Joker"; COLLIN GYETVAI a/k/a "Cid" and "CollinOnDex"; JORDAN NEWCOMBE BOOTHEY a/k/a "Bossnight55" and "Aussie"; DOE 1 a/k/a "Seemo"; DOE 2 a/k/a "CEO," "wndprochandler," and "8485"; and DOES 3 through 10, inclusive,

Defendants.

CASE NO. 2:25-cv-04075

**FIRST AMENDED COMPLAINT FOR:**

**(1) TRAFFICKING IN CIRCUMVENTION DEVICES [17 U.S.C. § 1201]**

**(2) VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT [18 U.S.C. § 1030]**

**(3) VIOLATION OF CALIFORNIA PENAL CODE SECTION 502**

**(4) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

**(5) BREACH OF CONTRACT**

**(6) UNFAIR COMPETITION**

**Demand For Jury Trial**

Activision Publishing, Inc. ("Activision" or "Plaintiff") alleges as follows:

## PRELIMINARY STATEMENT

1. Activision owns and publishes the *Call of Duty* series of video games (the "COD Games"). Activision seeks to end Defendants' unauthorized development, distribution, and sale of software products designed to disrupt, alter, or impair the functioning of the COD Games and their multiplayer servers. These software products, which include those known as "Lergware" and "GameHook" (the "COD Hacks"), allow malicious players to disconnect (or "kick" or "boot") players from multiplayer servers or give them competitive advantages over other players (such as automatic aiming or the ability to locate opponents through walls or other obstacles). The COD Hacks impair and damage Activision's COD Games, its business, and the experience of the *Call of Duty* player community.

2. Defendant Ryan Rothholz (known most prominently online as "Lerggy") is an individual who (with the assistance of several anonymous individuals, such as those known as "Vortex" and "ShinyMan1") initially created and sold the "Lergware" COD Hack, a product designed to enable users to disconnect other players from multiplayer games, crash multiplayer servers, carry out remote attacks on players' computers, and otherwise harass *Call of Duty* players. After receiving a cease-and-desist letter from Activision demanding that he cease any further development and distribution of his COD Hacks, Rothholz responded by representing that he would comply with Activision's demands: "[W]ith the intention to maintain a cooperative spirit and out of respect for Activision Blizzard's intellectual property rights, I have chosen to comply with the cease and desist notice you have issued. I have voluntarily deactivated all the software that you named in your letter."

3. In reality, Rothholz never intended to comply with Activision's demands. Behind the scenes, Rothholz destroyed evidence of his conduct and

mocked the cease-and-desist letter, posting messages online such as "F—k Activision" and "it will be back up in a day guaranteed." Rothholz also distributed his source code to other video game hackers (such as Defendant Collin Gyetvai a/k/a "Cid"), and assisted them in creating and selling a new COD Hack known as "GameHook." Rothholz even told his online friends that Activision's cease-and-desist letters are "meaningless" and that within days of receiving the letter he had programmed a new COD Hack and figured out how to circumvent technical measures implemented by Activision to remedy his prior conduct. He also posted versions of Lergware on the online repository "GitHub." To conceal his unlawful activities from Activision, Rothholz deleted all of his online accounts and worked with other members of online hacking communities, including Defendants Gyetvai and Jordan Newcombe Boothey ("Bossnight55"), to assist with the creation and sale of the GameHook COD Hack. Activision is informed and believes, and on that basis alleges, that Defendants have received significant revenue from their activities, to the detriment of Activision and its player community and with the knowledge that their activities are causing serious harm to Activision and the COD Games.

4. Defendants not only know that their conduct is unlawful, but they engage in that conduct with the deliberate intent to harm Activision, its businesses, and its player community. In Rothholz's own words, "I'm doing all of [you] a favor killing [Call of Duty.]" Prior to filing this lawsuit, Activision gave each of the Defendants multiple opportunities to comply with Activision's demands without litigation. Rather than engage with Activision, each has ignored Activision's outreach, necessitating this lawsuit. In fact, since this lawsuit was filed, Defendants have become increasingly brazen and aggressive. Most notably, in September 2025 Gyetvai and/or those working in concert with him orchestrated an attack on certain COD Games, causing players' screens to display crude and offensive messages about Activision's counsel, including a "hoax" message falsely

informing players that their *Call of Duty* accounts were suspended and to contact Activision's counsel. Gyetvai then began marketing and selling his own version of the COD Hacks, which he calls "CidsHook," all while publicly mocking and verbally harassing Activision, its counsel, and this lawsuit.

5. Activision asks this Court to put a stop to Defendants' misconduct. Activision is entitled to monetary damages, injunctive and other equitable relief, and punitive damages against Defendants.

## JURISDICTION AND VENUE

6. This is a civil action seeking damages, injunctive relief, and other equitable relief under the anti-circumvention provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, California Penal Code Section 502, and the common law of the State of California.

7. This Court has subject matter jurisdiction over Activision's DMCA claim and CFAA claim pursuant to 28 U.S.C. §§ 1331 and 1338(a). Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Activision's state law claims for violation of California Penal Code Section 502, intentional interference with contract, breach of contract, and unfair competition, which are so related to Activision's federal claims as to be part of the same case or controversy.

8. This Court has personal jurisdiction over each of the Defendants, because Defendants have purposefully directed their activities at the United States, and at California in particular, have purposefully availed themselves of the benefits of doing business in California, and have established a continued presence in California. Activision is informed and believes, and on that basis alleges, that, without limitation:

(a) The ***only*** purpose of the COD Hacks is to harm video games developed and published by Activision in the State of California, with the goal of

obtaining substantial (and unlawful) monetary gain for Defendants. Thus, the COD Hacks were developed and designed to target Activision and its products, to devalue the massive investment Activision has made in the COD Games, and to degrade the work of developers, programmers, artists, game designers, software engineers, online security experts, and others who worked on the COD Games. Indeed, the COD Hacks are parasitic in nature, in that they derive value only from the COD Games, and their very existence relies on Activision's continued support for the COD Games, which were created in California and published by a California company.

(b) Defendants conduct extensive and ongoing business with users in the State of California and the United States. Specifically, Defendants distribute the COD Hacks in the State of California, advertise and market the COD Hacks in the United States and the State of California, and communicate directly with users of the COD Hacks in the United States and in the State of California.

(c) Defendants market the COD Hacks to users in the United States, including in the State of California, knowing that a substantial market exists for their COD Hacks in the United States.

(d) Defendants recruit individuals in the United States to distribute the COD Hacks in (and from) the United States, and specifically, California, by reselling the COD Hacks to consumers located there.

(e) Defendants have entered into, and continue to enter into, contracts with individuals in the State of California, including contracts pursuant to which these individuals license from Defendants the right to install and use the COD Hacks. In return for such licenses, Defendants receive ongoing recurring daily, weekly, or monthly payments from individuals in the United States and the State of California.

(f) Defendants contract with entities located in the State of California in connection with their businesses related to the COD Hacks. This

includes, for example, domain name registries, hosting or content delivery services, as well as credit card processors and merchant banks.

(g) Defendants engage in conduct that they know is likely to cause harm to Activision in the State of California, including in this District, where Activision is located and has its principal place of business.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this is a judicial district in which a substantial part of the events giving rise to the claims occurred, and/or in which Activision's injuries were suffered.

## THE PARTIES

10. Activision is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Santa Monica, California.

11. Activision is informed and believes, and on that basis alleges, that Defendant Ryan Rothholz a/k/a "Lerggy," "Lerg," "Lergster," "The Pimp," "Joker0699," and "Joker" (referred to herein as "Rothholz") is an individual who resides in Antioch, Tennessee. On information and belief, Rothholz was the developer and/or distributor of the COD Hack known as "Lergware" and the registered owner of the domain names www.lergware.gg and gamehook.cc. Rothholz also developed or participated in the development of the COD Hack known as "GameHook" (sometimes referred to by its users as "G H").

12. Activision is informed and believes, and on that basis alleges, that Defendant Collin Gyetvai a/k/a "Cid" and "CollinOnDex" (referred to herein as "Gyetvai") is an individual who resides in Carbondale, Pennsylvania. On information and belief, Gyetvai participated in the development of GameHook, has acted as a reseller of the COD Hack GameHook via an online storefront on the online marketplace, MySellAuth.com, and has marketed and promoted GameHook via a dedicated Discord server and via his personal YouTube and X accounts.

Additionally, Gyetvai is the distributor of COD Hacks known as "N—rb0t," "AlwaysLose" and "CidsHook." On information and belief, Gyetvai markets CidsHook via a dedicated website located at www.cids.cc.

13. Activision is informed and believes, and on that basis alleges, that Defendant Jordan Newcombe Boothey is an individual who resides in Whyalla Stuart, Australia. On information and belief, Boothey has acted as a reseller of the COD Hack GameHook on the online marketplace, MySellAuth.com, and has marketed and promoted GameHook via a dedicated Discord server.

14. Activision is informed and believes, and on that basis alleges, that Defendant Doe 1 a/k/a "Seemo" (referred to herein as "Seemo") is an individual whose identity has not yet been confirmed by Activision. On information and belief, Seemo is a software developer who participated in the development of GameHook and/or has developed (or is in the process of developing) other COD Hacks, such as the product known as "OneShot."

15. Activision is informed and believes, and on that basis alleges, that Defendant Doe 2 a/k/a "CEO," "wndprochandler," and "8485" (referred to herein as "CEO") is an individual whose identity has not yet been confirmed by Activision. On information and belief, CEO is a software developer who participated in the development of GameHook and/or has developed (or is in the process of developing) other COD Hacks.

16. The true names and capacities, whether individual, corporate, associate, or otherwise, of the Doe Defendants, including Seemo and CEO, are unknown to Activision, which has therefore sued said Defendants by such aliases and fictitious names. Among the Doe Defendants are developers, resellers, technical support staff, and other individuals who have participated in the development, sale, and distribution of the COD Hacks. Activision will seek leave to amend this complaint to state their true names and capacities once said Doe Defendants' identities and capacities are ascertained.

17. Activision is informed and believes, and on that basis alleges, that all Defendants sued herein are liable to Activision as a result of their participation in all or some of the acts set forth in this First Amended Complaint. (All of the aforementioned Defendants, including the named Defendants and the Doe Defendants, are referred to herein collectively as "Defendants.")

## FACTS APPLICABLE TO ALL CLAIMS

### Activision's Intellectual Property Rights

18. Activision is the publisher and owner of all rights, title, and interest in the copyrights in the COD Games, which consist of more than 18 video games released since 2003 on various video game platforms. Activision's copyrights in the COD Games include, without limitation, rights in and to the COD Games' computer software and the audiovisual works and screen displays that are created when the COD Game software interacts with a user's computer. Activision's copyrights in the COD Games also include the dynamic non-literal elements created when the COD Games' software interacts with the COD Games' online multiplayer game servers. *See MDY Indus. v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010). Activision possesses valid, registered copyrights in each of the COD Games.

### The COD Games

19. The COD Games have been released annually, with live operations and with additional downloadable content released regularly. The COD Games are consistently among the best-selling games in a given year, having sold hundreds of millions of copies to date. Among Activision's popular COD Games are *Call of Duty Modern Warfare, Call of Duty: Modern Warfare 2, Call of Duty: Black Ops 3, Call of Duty: Black Ops Cold War, Call of Duty: Black Ops 6,* and *Call of Duty: Warzone*.

20. The COD Games are "first-person shooter" video games that allow players to step into the shoes of soldiers and elite operators in combat throughout history, ranging from World War II to modern day and into the future. Nearly all of the COD Games include single player campaign story modes which place players within a fictional narrative. However, all COD Games include competitive online multiplayer modes, where players join online to play together in real-time. Each of the COD Games offer as many as a dozen or more different online multiplayer game types, all of which are extremely intense as players compete to earn experience points, increase their rankings and statistics, and acquire various rewards for winning matches and achieving certain goals and objectives.

21. For example, in March 2020, Activision released *Call of Duty: Warzone*, a free standalone multiplayer game that is offered to the public without requiring that the customer purchase a copy of any *Call of Duty* game. In order to play *Call of Duty: Warzone*, a member of the public must register an account with Activision, download the *Call of Duty: Warzone* software, and connect to Activision's online multiplayer servers. The revenue Activision generates through *Call of Duty: Warzone* comes exclusively from sales of "virtual goods" (*e.g.*, weapons, skins) or seasonal "battle passes" that enable the player to receive in-game rewards for accomplishments within the game. Such revenue helps pay for the enormous cost of updating, improving, and maintaining the COD Games and their competitive online modes.

22. Activision works very hard to ensure that the COD Games offer consistently compelling player experiences so that customers will remain engaged in the COD Games, continue to play them for sustained periods of time, and be excited about future releases. If players perceive that a game is unfair or that the multiplayer experience is not working properly, including because others are cheating or disrupting and/or hacking multiplayer servers, players may grow frustrated with the COD Games, become less interested in playing and supporting

them (including by purchasing new games and items) and may even stop playing entirely. Cheating and hacking therefore not only harms (and could even destroy) the COD Games' player communities, but also impacts Activision's ability to offer the fast-paced, stable, high-quality online gameplay millions of fans have come to expect from Activision and the COD Games.

**<u>Activision's Efforts To Protect Against Hackers And Cheaters</u>**

23. Because the COD Games are so popular, unscrupulous individuals such as Defendants seek to exploit the games for their own personal gain and profit by selling cheats, hacks, and other malicious software, knowing full well that they are ruining the experience for other players and harming Activision. For this reason, Activision undertakes significant efforts to protect the integrity of the COD Games through both technical and contractual means.

<u>Technical Protection</u>

24. One way that Activision seeks to protect the COD Games from cheating or unauthorized exploitation is by developing and employing anti-cheat, anti-tampering, and other technical protection measures. These technologies help detect when players are using third party cheating or hacking software. They also prevent unauthorized access to and manipulation of the COD Games by those players. It is not possible to play the COD Games' online multiplayer modes without installing Activision's anti-cheat technologies.

25. When Activision identifies or detects that a player is using cheating software, the player's account may be suspended or "banned," such that the player may no longer access the game and its remote server.

26. In order for any hack or cheat software to operate, it must be designed to prevent or avoid detection by Activision's technical protection measures, such as by concealing itself or by disabling the anti-cheat technology. Otherwise, the software will be detected and the user will be denied access to the particular

game's online multiplayer functionality, and may even be permanently banned from playing the game.

Contractual Protection

27. In order to access or play the COD Games, users must create and register accounts with Activision. After installation and upon first playing the COD Games, users must expressly assent to Activision's Terms of Use (collectively, the "TOU") by clicking through them. If the user refuses to consent to the TOU, they cannot proceed and play the game. After agreeing to the TOU (and other agreements), users are prompted to create an Activision account (or log into an existing account), and cannot proceed to play the COD Games until they do so.

28. The TOU includes a limited license agreement between Activision and its users. Under the TOU, Activision grants to users a "personal, limited, non-exclusive license" to use its games for "non-commercial use," expressly conditioned upon the user's compliance with the TOU. Among other provisions, by assenting to the TOU, users expressly agree not to "use, develop, host or distribute cheats, automation software (bots), modded lobbies, hacks, mods or any other unauthorized third-party software" in connection with Activision's games "or engage in any form of cheating, boosting, or booting[.]"

29. Players of COD Games (including each of the games referenced herein) also are required to abide by the Code of Conduct posted at https://www.callofduty.com/values (the "Code of Conduct"). The Code of Conduct provides, among other things, that players must "compete with integrity" when playing the COD Games against other players, and expressly states that "[c]heating and griefing or other threats to fair play will not be tolerated." The Code of Conduct further states that players are responsible for how their accounts are used, and that "[t]he use of cheats, including third-party software, is

unacceptable." For the avoidance of any doubt, the Code of Conduct provides that "engaging in any activity that grants an unfair advantage is considered cheating."

30. The COD Games' online multiplayer modes are made available to the public through Activision's proprietary servers and matchmaking systems. It is not possible for a user to lawfully obtain access to or play the COD Games' online multiplayer modes without expressly consenting to the TOU, and users only maintain such access provided they are in compliance with the Code of Conduct. Activision provides access to the COD Games and their multiplayer servers in reliance on players' consent to the TOU.

31. As set forth below, Activision is informed and believes, and on that basis alleges, that Defendants are engaged in various activities related to developing, updating, marketing, distributing, selling, and supporting the COD Hacks.

**Defendant Rothholz and the Lergware COD Hack**

32. Activision is informed and believes, and on that basis alleges, that Rothholz is the developer and coder of a COD Hack known as "Lergware." The primary function of Lergware is to enable its users to disrupt *Call of Duty* matches and harass other *Call of Duty* players by, for example, kicking or "booting" other players from multiplayer games without their knowledge or consent. In other words, using the Lergware COD Hack, mean-spirited players could harass others by causing them to lose their connection to the COD Games or cause their COD Games' software to crash or stop working.

33. Activision is informed and believes, and on that basis alleges, that Rothholz developed and released Lergware in or about 2021 or 2022. In its original form, Lergware enabled players to cheat in, exploit, and harass players in games such as *Call of Duty: Black Ops 3*, *Call of Duty: Infinite Warfare,* and *Call of Duty: Black Ops Cold War*. Rothholz also posted versions of Lergware to his personal GitHub software repository, located at www.github.com/lerggy. In 2022

or 2023, Rothholz updated Lergware to enable it to function with Activision's recently-released game *Call of Duty: Modern Warfare II.*

34. Activision is informed and believes that in or about May 2023, Rothholz registered the domain name Lergware.gg, purchased website hosting services, and launched an official "Lergware" website at www.lergware.gg (the "Lergware Website"). Via the Lergware Website, Rothholz marketed and promoted at least five versions of Lergware, with the motto: "The best cheat for the right price."

35. Each of the versions of Lergware promoted on the Lergware Website was designed to work with a different COD Game. Specifically, Rothholz touted that among the "GAMES WE HAVE CHEATS FOR" were *Call of Duty: Black Ops 3, Call of Duty: Black Ops 4,* and *Call of Duty: Infinite Warfare* for $50; Lergware for *Call of Duty: Black Ops Cold War* for $75, and Lergware for *Call of Duty: Modern Warfare II* for $100. To purchase Lergware, Rothholz invited potential customers to "join our discord by clicking this link." On the Lergware Website, Rothholz promoted and advertised all versions of Lergware as "Undetected" and "Undetectable" by Activision. He also touted that Lergware contained "many exploits within our cheats," including those "that allow you to crash/kick/exploit players."


DOWNLOAD
COMMUNITY
PURCHASE
LOGIN
REGISTER
LERGWARE
The best cheat for the right price.
Get Started


GAMES WE HAVE CHEATS FOR
CALL OF DUTY BLACK OPS III
CALL OF DUTY BLACK OPS
CALL OF DUTY INFINITE WARFARE
CALL OF DUTY BLACK OPS COLD WAR
CALL OF DUTY MW II
BATTLEFRONT II
Undetectable
We use many ways of keeping our cheat undetected, so no need to worry about being banned.
Exploits
We have many exploits within our cheats that allow you to crash/kick/exploit players.

36. Rothholz's widespread marketing and distribution of Lergware resulted in online player "attacks" becoming increasingly frequent, causing some users to post warning messages online and advising players not to play certain COD Games. Rothholz also has personally used his Lergware product (or other similar products) to harass players and ruin their experiences in the COD Games. In fact, numerous users posted about their negative experiences encountering Rothholz personally (or those using his Lergware software), such as the following:

- "If you don't know who Lerggy is, he's been going into BO 3 [*Call of Duty: Black Ops 3*] and BO4 [*Call of Duty: Black Ops 4*], hacking in people's lobbies and DDOS-ing people for whatever reason. I don't know what I did to deserve this punishment…"
- "Literally my first match on, run into guys named Walrex [] and Lerggy. Lerggy says 'lemme show you a fatal error' and proceeds to crash the game, leading me to restart my whole PC."
- "Lerggy [c]an crash your games, change names in-game, besides [cheating]"
- "I can't even kill anyone in the game at all and everytime I respawn it says a long custom message followed by (this message was funded by the Lergware remastered anti-cheat foundation made by Lerggy0477) what can I do..?"

37. On or about June 1, 2023, Activision sent a cease-and-desist letter to Rothholz advising him that Lergware violated Activision's intellectual property rights. The letter demanded that Rothholz immediately cease and desist from any further development, sale, or distribution of Lergware.

38. Shortly after receiving Activision's cease-and-desist letter, Rothholz posted the letter to an online Discord community dedicated to Lergware and openly mocked Activision, stating: "Welp Boys I GOT A C&D. [Laughing

emoji]. that didn't take long. My response is F--- ACTIVISION LETS TURN UP."



39. In contrast to the defiant statement Rothholz made privately to his friends and player community, on or about June 7, 2023, Rothholz publicly purported to comply with the cease-and-desist letter, and posted the following to his X profile (@lergware):




40. On or about June 12, 2023, Rothholz sent a purported "compliance confirmation" email to Activision. In his "compliance confirmation," Rothholz denied that his conduct infringed any of Activision's intellectual property rights, but did not dispute that he was responsible for (or, at minimum, had control over) Lergware and agreed to comply with Activision's demands:

> I hope this message finds you well. I am writing in response to your letter received on Tuesday, June 6th, 2023, alleging infringement of Activision Blizzard Inc.'s intellectual property rights.
>
> Firstly, I want to clarify that this email should not be interpreted as an acknowledgment of your claim, nor an admission of guilt on my part.
>
> However, with the intention to maintain a cooperative spirit and out of respect for Activision Blizzard's intellectual property rights, I have chosen to comply with the cease and desist notice you have issued. I have voluntarily deactivated all the software that you named in your letter. This action was taken not as an acceptance of liability but as a gesture of goodwill.

41. In reliance on Rothholz's representations, Activision did not pursue litigation against Rothholz in 2023.

## **Defendants and the GameHook COD Hack**

42. Activision is informed and believes, and on that basis alleges, that, contrary to his public representation that he would comply with Activision's demands, Rothholz did not actually cease developing, distributing, and exploiting COD Hacks. Instead, Rothholz promptly "rebranded" or modified Lergware, changed his online alias, transferred or sold his source code to others, and/or began working with individual "resellers" to distribute COD Hacks under a different name. In fact, moments after receiving the cease-and-desist letter, Rothholz posted that he "sold source to another gamer hacker named jerry. it will be back up in a day guaranteed." Then, some months after receiving the cease-and-desist letter, Rothholz bragged to his friends that "C&Ds mean nothing" and "I had my new cheat working within two days of the C&D." Rothholz also deleted many of his social media accounts, including his accounts on Discord and Twitter.

43. Activision is informed and believes, and on that basis alleges, that throughout 2024 and 2025 Rothholz created dozens of *Call of Duty* accounts, which he used to test and further develop COD Hacks. Each time Rothholz created one of these accounts, he assented to Activision's TOU, even though he had no intention of complying with the terms of the TOU. Activision detected that Rothholz was engaged in improper cheating or cheat-development activities using these *Call of Duty* accounts, and terminated Rothholz's access to Activision's *Call of Duty* servers on several different occasions. However, Rothholz repeatedly created new *Call of Duty* accounts under different names and different email addresses, in an effort to improperly obtain access to the *Call of Duty* servers and with full knowledge that his access to those servers had been revoked.

44. Activision is informed and believes, and on that basis alleges, that in 2023, Rothholz, with the assistance of Defendants Gyetvai, Boothey, and one or more of the Doe Defendants, developed new version of Lergware known as "GameHook."

45. Activision is informed and believes, and on that basis alleges, that on or about August 2023 (one month after receiving the cease-and-desist letter), Rothholz registered a domain name (www.gamehook.cc) for a new website to promote and sell "GameHook" (the "GameHook Website"). The GameHook Website went live in early or mid 2024, and featured video captures of GameHook being used to cheat in the COD Games:




46. Like the Lergware COD Hack, GameHook includes a set of self-titled "Toxic" features and functions, including features that enable users to "kick" or disconnect other players from Activision's multiplayer servers (sometimes referred to as a "rage" cheat) and/or to crash multiplayer servers. Additionally, GameHook offers a variety of features that allow players to cheat or gain unfair advantages

over other players. Such features include, without limitation, "aimbots," which cause weapons to automatically hit opponents, and "ESP Bots," which identify opponent positions and allow players to see through walls or other obstacles. GameHook was made available for several COD Games, including *Call of Duty: Modern Warfare II, Call of Duty: Modern Warfare III, Call of Duty: Black Ops Cold War,* and *Call of Duty: Black Ops 6.*

47. Activision is informed and believes, and on that basis alleges, that GameHook incorporates code from Lergware and was developed, in whole or in part, by Rothholz, with assistance from one or more of the other Defendants.

48. Activision is informed and believes, and on that basis alleges, that in an effort to conceal his involvement with GameHook, Rothholz changed his online alias from "Lerggy" to "Joker." However, he continued to use the same Discord account and user ID. He also posted messages to Discord promoting GameHook, including a message on February 3, 2025 stating that GameHook is "only available here and in the official gamehook discord." Additionally, instead of selling GameHook directly to end-users, Rothholz engaged friends and online community members to act as GameHook "resellers." These resellers sell the GameHook COD Hack on Rothholz's behalf and retain a portion of the revenue from such sales. Among these resellers were Gyetvai and Boothey (together, the "Reseller Defendants"), along with an individual known as "Skyserpent."

49. Each of the Reseller Defendants operated websites or online storefronts from which versions of GameHook could be purchased by members of the public. Activision is informed and believes, and on that basis alleges, that Defendants offered versions of GameHook for sale for at least $50.00 per COD Game and at least $300 for lifetime access to a "master key" to use all GameHook versions for all supported COD Games, as illustrated below:




50. On information and belief, hundreds, if not thousands, of individuals purchased the GameHook COD Hack, and used it to cheat in the COD Games or disconnect *Call of Duty* players from multiplayer games. Activision also is informed and believes, and on that basis alleges, that more than a thousand players of Activision's recent COD Game, *Call of Duty: Black Ops 6,* have been impacted by GameHook, including by being kicked from multiplayer matches or suffering unexpected server crashes.

51. In March 2025, Activision sent cease-and-desist letters to Rothholz, Gyetvai, Boothey, and Skysserpent. The cease-and-desist letters demanded, among other things, that each recipient cease any further development or distribution of GameHook or any other *Call of Duty* cheating or hacking software. Activision is informed and believes, and on that basis alleges, that Rothholz, Gyetvai, Boothey, and Skysserpent each received the cease-and-desist letters, and some of them even posted online about their receipt of the letters.

52. In mid-March 2025, apparently in response to the letters, Gyetvai, Boothey, and Skysserpent shuttered their online storefronts. However, despite

acknowledging online that they had received the letters, Rothholz, Gyetvai, and Boothey did not contact Activision and did not confirm that they would cease from creating or selling COD Hacks. Additionally, none of these individuals provided copies of the GameHook source code to Activision. Activision is informed and believes, and on that basis alleges, that instead of complying with Activision's March 2025 cease-and-desist letter, Rothholz attempted to scrub his online profile, deleted many of his online accounts (including his GitHub and Discord accounts), closed a number of email accounts, and deleted or destroyed any source code residing on his computer.

53. Activision is informed and believes, and on that basis alleges, that Rothholz, Gyetvai, and Boothey do not intend to refrain from developing and distributing COD Hacks. To the contrary, given Rothholz's prior conduct as alleged herein, Activision has reason to believe that Rothholz, Gyetvai, and Boothey are continuing to distribute or sell COD Hacks through private channels or via Discord servers.

**<u>Gyetvai's Continued Distribution of COD Hacks And Ongoing Harassment Campaign</u>**

54. Activision is informed and believes, and on that basis alleges, that since this lawsuit was filed, Defendant Gyetvai has escalated his unlawful activities. Most notably, Gyetvai created or developed his own versions of Lergware and GameHook, including products which he called "N—rb0t," "AlwaysLose" and "CidsHook." Gyetvai promoted "AlwaysLose" at a website located at www.alwayslose.cc and has been promoting and selling CidsHook through a dedicated website located at www.cids.cc (the "CidsHook Website").

55. The CidsHook Website claims that CidsHook allows players to cheat and disrupt multiplayer matches in the games *Call of Duty: Black Ops 3, Call of Duty: Black Ops 2,* and *Call of Duty: Modern Warfare 2*. The CidsHook Website

also promotes a variety of "features" offered by Cidshook, such as (1) "Aimbot," allowing players to "hit[] exactly where you look" and "the ability to shoot through walls without effort;" (2) "Visuals" that allow players to "know everything" and "show you exactly where the competition is hiding;" and (3) various player harassment features, such as the ability to "spoof your chat messages," "run the lobby with forcehosting," "send custom packets to take over as host," and "edit your rank or stats with a single click." Representative images from the CidsHook Website appear below:




Black Ops 2
The classic, perfected.
AIMBOT
Fast and accurate. Features instant snap-to-target, auto-fire, and smooth tracking that handles the prediction for you.
VISUALS
Clean and simple. Standard box ESP and snaplines that show you exactly where the competition is hiding.
MISC
Identity control. Pull players into your games, spoof your XUID, and send custom packets to take over as host.
SECURITY
Stay invisible. Every public and private RCE is patched. We drop exploitative network packets before they ever reach your game.




56. Activision is informed and believes, and on that basis alleges, that because Gyetvai is aware of this litigation, he does not offer CidsHook directly for sale on the CidsHook Website. Instead, Gyetvai exhorts potential customers to contact him on the social media platform "Discord," where he uses the name "cids," as illustrated below:




57. CidsHook has caused significant monetary and reputational damage to Activision. Numerous *Call of Duty* players have recounted their negative experiences when encountering Cids or players using CidsHook. As one player noted, "I was instantly thrown into a cidshook lobby. I was unable to leave the game. My game then crashed and restarted on its own, and when it restarted, my username was changed to "cidshook#1." Others have commented that "Cids ruined Black Ops 3," that "This cids guy… took it upon himself to ruin this game singlehandedly," and that players should not "even bother trying to play [*Call of Duty: Black Ops 3*]" because of Gyetvai's activities.

58. Activision also is informed and believes, and on that basis alleges, that Gyetvai has engaged in an ongoing campaign of harassment targeting Activision, the COD Games, and Activision's outside litigation counsel. This

harassment campaign has been carried out in multiple ways.

59. First, Activision is informed and believes, and on that basis alleges, that in July and August 2025, Gyetvai launched an attack or assisted in launching an attack on the multiplayer servers for the Xbox Gamepass version of the game *Call of Duty: WWII.* Specifically, in July 2025, Gyetvai or those working in concert with him caused players of *Call of Duty: WWII* to receive various messages on their personal computers that included the names and images of Activision's counsel.

60. Second, Gyetvai has been posting a stream of obnoxious, anti-Semitic, and harassing online posts targeting Activision's counsel, including photoshopped or AI-generated images of Mr. Mayer and Mr. Humphrey containing overtly racist and anti-Semitic content. In one of these posts, Gyetvai taunted Activision and its counsel by stating: "F--- you Marc E. Mayer I'll keep crashing servers."

61. Third, Gyetvai or those working in concert with him have created fake *Call of Duty* accounts using Mr. Mayer's name, preceded by the word "JEW," and then used those accounts to harass other players and cheat in *Call of Duty* games. Gyetvai then re-posted online comments accusing Mr. Mayer of cheating in *Call of Duty*, along with AI-generated caricatures of his law firm profile picture.

62. Fourth, most recently, Gyetvai has been launching attacks on the game *Call of Duty: Black Ops 2*, where he has caused text files to open on users' computers with obscene and offensive messages using counsel's name, such as the below (which occurred on or about July 22, 2026):






63. Thus, Gyetvai has made clear that he has no intention of ceasing his activities without relief from this Court and believes that by failing to appear in this action he can continue engaging in unlawful, destructive conduct with impunity.

## Defendants' Unlawful Activities

64. Defendants have violated Activision's rights in numerous respects.

65. First, Activision is informed and believes, and on that basis alleges, that in order for any of the COD Hacks, including Lergware and GameHook, to operate with the COD Games, such software necessarily includes technology that primarily is designed to avoid, bypass, evade, or otherwise circumvent Activision's anti-cheat and access control technologies. Defendants also advertise and promote

the COD Hacks as effectively circumventing Activision's anti-cheat software and cheat detection methods. Accordingly, each time Defendants distribute or sell a license to any of the COD Hacks, they are trafficking in technology that controls access to the COD Games.

66. Second, in the normal course of their operation, the COD Hacks–and, in particular, those functions included in the COD Hacks that enable users to "kick" players from multiplayer matches–cause the unauthorized and harmful transmission of programs, code, or commands to Activision's *Call of Duty* servers. These programs, code, or commands are designed to cause Activision's *Call of Duty* servers to malfunction, resulting in players losing their connection to the servers, encountering software crashes, or receiving offensive or spam messages.

67. Third, each time a player uses a COD Hack, he or she also violates Activision's TOU, including those provisions that specifically prohibit players from "us[ing], develop[ing], host[ing] or distribut[ing] cheats, automation software (bots), modded lobbies, hacks, mods or any other unauthorized third-party software" in connection with Activision's games "or engag[ing] in any form of cheating, boosting, or booting." Accordingly, Activision is informed and believes, and on that basis alleges, that as a result of Defendants' conduct, hundreds or thousands of breaches of these contracts have occurred.

68. Activision is informed and believes, and on that basis alleges, that Defendants are fully aware that the use of the COD Hacks violates the TOU. Indeed, the COD Hacks have no purpose or function other than to enable players to gain unauthorized access to Activision's servers and violate the TOU by using cheats and exploits. Thus, Defendants' goal is to ensure that their customers continue to receive the benefits of their contracts with Activision (*i.e.*, access to the COD Games and their multiplayer experience) while they simultaneously engage in continuing breaches of their obligations under these contracts.

69. Fourth, Defendants have themselves personally engaged in unlawful attacks on Activision's servers. In so doing, Defendants have directly violated federal and state laws that prohibit such conduct. They also have exceeded their authorized access to these servers and, after losing such access, improperly obtained access to such servers through fraud and deception. Additionally, by engaging in such conduct Defendants themselves breached the TOU.

70. By their conduct, Defendants have caused and are continuing to cause serious harm to the COD Games, to Activision's multiplayer game servers, and to Activision. Such harm is immediate, massive and irreparable, and includes (but is not limited to) the following:

(a) Defendants' conduct irreparably harms the ability of Activision's legitimate customers to enjoy and participate in the online experiences carefully created by Activision. As a result, Activision has suffered, and continues to suffer, loss of player revenues.

(b) Defendants' knowing and willful misconduct has forced Activision to expend substantial resources attempting to remediate the damage caused by the COD Hacks. This includes creating and releasing updates to the COD Games that counteract the COD Hacks, responding to player complaints, employing personnel to police the games to detect the use of the COD Hacks, and "banning" users who are using the COD Hacks.

(c) Defendants' conduct harms Activision's reputation and results in the loss of significant customer goodwill. In fact, GameHook has been so frustrating to *Call of Duty* players that it received significant attention on social media and, on information and belief, has caused players to stop playing or avoid the PC versions of several COD Games, including *Call of Duty: Black Ops 6*.

71. Defendants' conduct has resulted in damage to Activision in an amount to be proven at trial. By Activision's estimation, such damage may amount to millions of dollars.

72. Unless and until Defendants are preliminarily or permanently enjoined, Activision will continue to suffer severe harm from the COD Hacks.

## COUNT I

## Trafficking In Circumvention Devices

73. Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 72, as if set forth fully herein.

74. The COD Games, including but not limited to their source code and audiovisual game play environments, are copyrighted works.

75. Activision has incorporated into the COD Games technological measures that effectively control access to the COD Games, including access to the dynamic audiovisual elements that comprise the COD Games.

76. The COD Hacks are comprised of or contain technologies, products, services, devices, components, or parts thereof that primarily are designed or produced for the purpose of circumventing Activision's technological measures that effectively control access to the COD Games.

77. The COD Hacks (and the portions thereof that circumvent Activision's anti-cheat technologies) have no commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a copyrighted work and that protects the exclusive rights of Activision as the copyright owner.

78. Defendants market the COD Hacks in the United States with knowledge of their use to circumvent Activision's technological access controls.

79. As a result of the foregoing, Defendants are offering to the public, providing, importing, or otherwise trafficking in technology that violates 17 U.S.C. § 1201(a)(2).

80. Defendants' acts constituting DMCA violations have been and continue to be performed without the permission, authorization, or consent of Activision.

81. Defendants have violated Section 1201 of the DMCA willfully and for private commercial gain.

82. Defendants' conduct has caused damage to Activision and has unjustly enriched Defendants, in an amount to be proven at trial.

83. As a result of Defendants' acts and conduct, Activision has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Activision is informed and believes, and on that basis alleges, that, unless enjoined and restrained by this Court, Defendants will continue to violate Section 1201 of the DMCA. Activision is entitled to injunctive relief to restrain and enjoin Defendants' continuing unlawful conduct.

84. As a direct and proximate result of Defendants' conduct, pursuant to 17 U.S.C. § 1203(c), Activision is entitled to Defendants' profits attributable to their violations of 17 U.S.C § 1201.

85. Alternatively, Activision is entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 1203(c)(3)(A), in the amount of $2,500 with respect to each violation by Defendants.

86. Activision further is entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 1203(b).

**COUNT II**

**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.***

87. Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 86, as if set forth fully herein.

88. Activision's COD Game servers (the "Game Servers") are computer servers used by Activision to engage in interstate and foreign commerce. The Game Servers are protected computers under 18 U.S.C. § 1030(e)(2).

89. Defendants have personally engaged in activities that violate the CFAA. Specifically, each of the Defendants intentionally accessed the Game Servers without Activision's authorization or exceeded their authorized access, including by using fraud and deceit to continue to access the Game Servers after their access was revoked. Defendants also knowingly caused the transmission of a program, information, code, or command in order to disconnect players and take control of Game Servers.

90. Gyetvai also violated the CFAA by engaging in directed attacks on Activision's Game Servers and causing text files and images to open on players' computers without Activision's knowledge or authorization.

91. Additionally, by developing, marketing, distributing, and encouraging the use of the COD Hacks, Defendants have knowingly aided and abetted, conspired with, or otherwise caused players of the COD Games to (a) intentionally access the Game Servers without Activision's authorization and/or (b) knowingly cause the transmission of a program, information, code, or command in order to intentionally cause damage to the Game Servers.

92. As a result of Defendants' conduct, Activision has suffered damages in excess of the $5,000 statutory minimum. Activision has been damaged by Defendants' actions, including in the form of decreased participation by players of the COD Games, investigative costs and legal fees, and the expenditure of resources to detect players who access the Game Servers without authorization using the COD Hacks.

93. Activision has also suffered irreparable and incalculable harm and injuries resulting from Defendants' conduct in the form of damages to its customers' goodwill and trust.

94. On information and belief, Defendants have continued to conspire to obtain unauthorized access to or to damage the Game Servers with the intent of harming Activision and will continue to do so unless enjoined.

**COUNT III**

**<u>Violation of California Penal Code § 502</u>**

95. Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 94, as if set forth fully herein.

96. Activision's Game Servers are "Computer Networks" as defined by California Penal Code §502(b). Additionally, Activision's COD Games (and, in particular, their multiplayer game modes) are "Computer Programs" and "Computer Services" as defined by Cal. Penal Code §502(b).

97. By the conduct alleged herein, Defendants violated California Penal Code §502(c) in several ways. First, Defendants knowingly accessed and without permission disrupted or caused the disruption of computer services (*i.e.*, the COD Games) by disconnecting and harassing players of the COD Games, including by making, distributing, and/or promoting Lergware, GameHook, and CidsHook. Second, Defendants (and Rothholz in particular) knowingly and without permission accessed or caused to be accessed the COD Games and the Game Servers, including by using fraud and deceit to access the Game Servers after their access was revoked. Third, Gyetvai and those working in concert with him engaged in directed attacks on Activision's Game Servers and caused text files and images to open on players' computers without Activision's knowledge or authorization.

98. Activision has been damaged by Defendants' actions, including in the form of decreased participation by players in the COD Games, investigative costs and legal fees, and the expenditure of resources to detect players who access the Game Servers without authorization using the COD Hacks. Activision has also

suffered irreparable and incalculable harm and injuries resulting from Defendants' conduct in the form of damages to its customers' goodwill and trust.

99. Defendants are guilty of oppression, fraud, or malice, and Activision, in addition to its actual damages, by reason thereof, is entitled to recover exemplary and punitive damages against Defendants pursuant to California Penal Code §502(e)(4).

100. On information and belief, Defendants have continued to conspire to obtain unauthorized access to or to damage the Game Servers with the intent of harming Activision and will continue to do so unless enjoined.

101. Activision further is entitled to its attorneys' fees pursuant to California Penal Code §502(e)(2).

**COUNT IV**

**Intentional Interference With Contractual Relations**

102. Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 101, as if set forth fully herein.

103. As described herein, in order to install and play the COD Games, licensed users in the United States first must assent to Activision's TOU. In addition to the TOU, licensed users also are required to comply with the Code of Conduct, in particular as relates to cheating and any other activities that grant an unfair advantage.

104. Activision's contracts with its users, including the TOU and Code of Conduct, are valid and enforceable.

105. Each time a purchaser of the COD Hacks uses a COD Hack in connection with the COD Games, he or she breaches the TOU and the Code of Conduct. Activision is informed and believes, and on that basis alleges, that thousands of such breaches have taken place by Defendants' customers.

106. Activision is informed and believes, and on that basis alleges, that Defendants are aware of both the existence and specific relevant terms of contracts between Activision and its users in the United States, including the TOU and Code of Conduct. Specifically, Defendants are aware that the TOU and Code of Conduct prohibit players from using the COD Hacks and that players are at risk of being banned from the COD Games should they be caught using the COD Hacks. Nevertheless, Defendants intentionally encourage and induce users of the COD Games to purchase and use the COD Hacks, knowing that the use of these products by their customers is a breach of these customers' contracts with Activision.

107. By inducing Activision's users to breach their contracts with Activision, Defendants have intentionally interfered, and continue to interfere, with the contracts between Activision and its users.

108. As a direct and proximate result of Defendants' actions, Activision has suffered damages in an amount to be proven at trial, including but not limited to a loss of goodwill among users of Activision's COD Games, diversion of Activision's resources to attempt to detect and prevent the use of the COD Hacks, decreased profits, and a loss of profits from users whose accounts Activision has terminated for violation of the TOU and Code of Conduct in the United States.

109. As a further result of Defendants' actions, Defendants have unjustly obtained specifically identifiable property, consisting of all of the proceeds attributable to the sale of the COD Hacks in the United States, and any other products or services that violate any of Activision's rights, and any additional property traceable to those proceeds. Those proceeds, which are directly attributable to Defendants' manipulation and misuse of the COD Games and intentional interference with Activision's contracts, rightfully and equitably belong to Activision.

110. Defendants' intentional interference with the contracts between Activision and its licensed users in the United States entitles Activision to

injunctive relief and compensatory damages, the imposition of a constructive trust over Defendants' wrongfully obtained proceeds, and other available relief.

111. Defendants are guilty of oppression, fraud, or malice, and Activision, in addition to its actual damages, by reason thereof, is entitled to recover exemplary and punitive damages against Defendants.

**COUNT V**

**Breach of Contract**

112. Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 111, as if set forth fully herein.

113. As described herein, in order to install and play the COD Games, licensed users in the United States first must assent to Activision's TOU. The TOU specifically prohibits users from (1) "us[ing], develop[ing], host[ing] or distribut[ing] cheats, automation software (bots), modded lobbies, hacks, mods or any other unauthorized third-party software in connection with the Product, or engage in any form of cheating, boosting, or booting;" (2) "disrupt[ing] or assist[ing] in the disruption of (i) any computer, device or server used to support the Product; or (ii) any other player's use of a Product;" and (3) "interfer[ing] or attempt[ing] to interfere with the operation of the Product in any way through any means or device including, but not limited to, launching a denial of service attack, spamming, hacking, or uploading computer viruses or time bombs."

114. Each of the Defendants assented to Activision's TOU when they created Call of Duty accounts, downloaded and/or installed one or more of the COD Games, and connected to Activision's Game Servers.

115. Activision's contracts with Defendants, including the TOU and Code of Conduct, are valid and enforceable.

116. By engaging in the conduct alleged herein, Defendants engaged in multiple, continuing breaches of the TOU and the Code of Conduct.

117. As a direct and proximate result of Defendants' actions, Activision has suffered damages in an amount to be proven at trial, including but not limited to a loss of goodwill among users of Activision's COD Games, diversion of Activision's resources to attempt to detect and prevent the use of the COD Hacks, decreased profits, and the expenditure of significant sums attempting to remediate the harm and identify Defendants.

**COUNT VI**

**Unfair Competition**

118. Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 117, as if set forth fully herein.

119. The acts and conduct of Defendants constitute unfair competition in the United States under California Business & Professions Code § 17200 *et seq.* and under California common law.

120. As a direct and proximate result of Defendants' unfair competition in the United States, Activision has been damaged, and Defendants have been unjustly enriched, in an amount to be proven at trial for which damages and/or restitution and disgorgement is appropriate. Such damages and/or restitution and disgorgement should include a declaration by this Court that Defendants are constructive trustees for the benefit of Activision, and an order that Defendants convey to Activision the gross receipts received or to be received that are attributable to the sale of the COD Hacks in the United States.

121. Defendants are guilty of oppression, fraud or malice, and Activision, in addition to its actual damages, by reason thereof, is entitled to recover exemplary and punitive damages against Defendants.

122. As a result of Defendants' acts and conduct in the United States, Activision has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Activision is

informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, Defendants will continue to engage in unfair competition. Pursuant to California Business & Professions Code § 17203, Activision is entitled to temporary, preliminary, and permanent injunctions prohibiting further acts of unfair competition.

## PRAYER FOR RELIEF

WHEREFORE, Activision prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award Activision relief, including but not limited to an order:

1. Preliminarily and permanently enjoining Defendants, their officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, affiliates, and all persons acting in concert or participation with Defendants from: (i) trafficking in circumvention devices in the United States; (ii) improperly accessing or damaging Activision's protected servers without authorization; (iii) knowingly accessing and without permission disrupting or causing the disruption of Activision's computer services; (iv) intentionally interfering with Activision's and its affiliates' contracts with players in the United States; (v) breaching their contracts with Activision, including the TOU and Conduct of Conduct; and (vi) engaging in unfair competition in the United States.

2. Requiring Defendants to shut down the COD Hacks, CidsHook, any forthcoming software that allows players to cheat in any game published by Activision or its affiliates, and any colorable copies thereof, hosted at any domain, address, location, or ISP.

3. Requiring Defendants to deliver to Activision for impoundment or destruction all copies of materials that infringe or violate any of Activision's rights, as described herein, including, without limitation, the source code for the COD Hacks and CidsHook; any computers or other devices used to engage in the

violations alleged herein; and any domain names or other assets and accounts used to engage in the violations alleged herein.

4. Requiring Defendants to provide Activision with an accounting of any and all sales of the COD Hacks and any other products or services in the United States that infringe or violate any of Activision's or affiliates' rights, as described herein.

5. Awarding Activision actual or maximum statutory damages for violation of Section 1201 of the DMCA, as appropriate, pursuant to 17 U.S.C. § 1203(c).

6. Awarding Activision exemplary and punitive damages against Defendants on Activision's causes of action for violation of Section 502 of the California Penal Code and for intentional interference with contractual relations.

7. Awarding Activision restitution of Defendants' unlawful proceeds, including an accounting of any and all sales of the COD Hacks in the United States, and/or any other products or services that violate any of Activision's rights described herein.

8. Awarding Activision its reasonable attorneys' fees with respect to Activision's causes of action for violation of Section 1201 of the DMCA and violation of California Penal Code 502.

9. Imposing a constructive trust over the proceeds unjustly obtained by Defendants through the sales of the COD Hacks in the United States, and/or any other products or services that violate any of Activision's rights described herein.

10. Awarding such other and further relief as this Court may deem just and appropriate.

///

///

///

///

DATED: OCTOBER 12, 2026

MITCHELL SILBERBERG & KNUPP LLP

By: */s/ Marc E. Mayer*

Marc E. Mayer (SBN 190969)
Mark C. Humphrey (SBN 291718)
Hannah Shepherd (SBN 347611)
Marissa B. Lewis (*Pro Hac Vice*)
Attorneys for Activision Publishing, Inc.

## JURY DEMAND

Activision Publishing, Inc. demands a trial by jury on all issues so triable.

DATED: OCTOBER 12, 2026 MITCHELL SILBERBERG & KNUPP LLP

By: */s/ Marc E. Mayer*
Marc E. Mayer (SBN 190969)
Mark C. Humphrey (SBN 291718)
Hannah Shepherd (SBN 347611)
Marissa B. Lewis (*Pro Hac Vice*)
Attorneys for Activision Publishing, Inc.